# United States Court of Appeals
## For the Eighth Circuit

_____

No. 12-2419

_____

Brian Johnson,

*Plaintiff - Appellant*,

v.

Minneapolis Park and Recreation Board,

*Defendant - Appellee*.

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: March 12, 2013
Filed: September 11, 2013

_____

Before WOLLMAN, BYE, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Brian Johnson appeals the district court's denial of his motion for a preliminary injunction against enforcement of a local regulation that restricts literature distribution in a public park during the Twin Cities Pride Festival. The district court ruled that Johnson's claim did not have a sufficient likelihood of success on the merits to warrant an injunction. This court, however, enjoined the regulation pending appeal, and we now reverse and remand for further proceedings.

I.

The Minneapolis Park and Recreation Board ("the Board") oversees Loring Park, a 42-acre public park in downtown Minneapolis. For more than thirty years, Loring Park has been the site of the two-day Pride Festival. The festival is hosted by Twin Cities Pride, a nonprofit organization whose stated mission is to "[c]reate experiences that bring the greater [gay, lesbian, bisexual, and transgender] community together."

During the Festival, Twin Cities Pride's use of Loring Park is nonexclusive, and admission to the park remains free and open to the public. The Festival includes three categories of official participants: sponsors, who advertise in exchange for compensating Twin Cities Pride; vendors, who sell products and solicit donations; and exhibitors, who display and distribute information about their organizations.

Participants must apply to Twin Cities Pride to operate booths from which they may distribute or sell their wares. The organization will sanction participants only if they sign a "non-discrimination statement," providing that the applicant does not "discriminate in hiring, employment, participation or services rendered based on the fact or perception of a person's race, color, creed, religion, national origin, ancestry, age, sex, sexual orientation, gender identity, domestic partner status, marital status, disability, or Acquired Immune Deficiency Syndrome or HIV status." *Gay-Lesbian-Bisexual-Transgender Pride/Twin Cities v. Minneapolis Park & Recreation Bd.*, 721 F. Supp. 2d 866, 868 (D. Minn. 2010) ("*GLBT Pride I*").

Johnson is a self-described "professing Evangelical Christian," who considers distributing copies of the Bible "essential to his expression." He began distributing Bibles at the Festival in approximately 1995; in many years thereafter, he secured an exhibitor's booth from Twin Cities Pride. In 2009, however, Twin Cities Pride denied Johnson's application for a booth. Johnson signed an application and the non-

discrimination statement, but the Festival Manager asked him three more questions: whether his activities at the Festival would "meet the intentions" of the non-discrimination statement; whether he believed that homosexuality or homosexual sex acts are sins; and whether he believed that sexual intercourse between persons of the same sex is a perversion. Johnson replied that he would "gladly hire a homosexual at my business if he/she could do the job," but expressed his belief that the Bible specifies homosexual conduct as a sin. He elaborated that he tries to avoid the subject of homosexuality when passing out Bibles at the Festival, and he does not believe that homosexual or heterosexual temptations, in and of themselves, constitute sin. The Festival Manager was not satisfied by this reply and declined to approve the application. Having no booth, Johnson attempted to distribute Bibles while walking through the park during the Festival, but Minneapolis police arrested him for trespassing when he refused to leave. The charge was later dismissed.

In anticipation of the 2010 Festival, Johnson requested and received from the Board assurances that he would not be forbidden to distribute literature within Loring Park during the Festival. After learning that the Board intended to permit Johnson to distribute Bibles, Twin Cities Pride brought an action against the Board pursuant to 42 U.S.C. § 1983, alleging that allowing Johnson to distribute literature during the Festival would violate Twin Cities Pride's rights under the First Amendment. *See generally GLBT Pride I*, 721 F. Supp. 2d 866. The district court granted Johnson's motion for permissive intervention, *id.* at 869 n.1, and denied Twin Cities Pride's motion for a temporary restraining order. *Id.* at 876. The court ruled that "[a]s a festival attendee in a public forum, Johnson is entitled to speak and hand out literature, quintessential activities protected by the First Amendment, so long as he remains undisruptive." *Id.* at 875. Johnson attended the 2010 Festival and distributed Bibles without incident.

In a footnote to its 2010 ruling, however, the district court responded to Twin Cities Pride's request for "guidance" and suggested that "a compromise may be

available." *Id.* at 875 n.2. The court theorized that "Twin Cities Pride could designate 'free speech zones' on the Pride Festival grounds in which anyone who wishes to distribute literature or display signage may do so." *Id.* The suggestion continued:

> [Park Board] police could enforce that area as a content-neutral restriction—assuming that those free speech zones provide attendees with ample alternative channels of expression, and assuming that oral communication would be permitted throughout the public forum. Attendees would thus have the opportunity to reach the minds of willing listeners, and Twin Cities Pride would have the opportunity to disclaim the content of such expression.

*Id.* (internal quotation and citations omitted).

Litigation resumed after the 2010 Festival. Twin Cities Pride amended its complaint to remove all references to Johnson. The amended pleading continued to assert that display of signs and distribution of literature by third parties within the Festival would violate the organization's First Amendment rights. Rather than focus on Johnson specifically, however, the amended complaint sought an order providing for "free speech zones," as suggested by the district court, and prohibiting the distribution of literature and the display of signage not authorized by Twin Cities Pride, except in booths and "free speech zones." Am. Compl. at 9, *Gay-Lesbian-Bisexual-Transgender Pride/Twin Cities v. Minneapolis Park & Recreation Bd.*, Civ. No. 10-2579, 2011 WL 1300381 (D. Minn. April 4, 2011) ("*GLBT Pride II*"). In light of these amendments, the court revoked Johnson's intervenor status, finding "no indication of collusion between Twin Cities Pride and [the Board]," and determining that "[the Board] can adequately represent Johnson's remaining interest." *GLBT Pride II*, 2011 WL 1300381, at *4. But the Board and Twin Cities Pride soon thereafter reached a settlement agreement that prevents Johnson from personally distributing literature within the Festival.

-4-

The settlement agreement provided that "because of the size of the Pride Festival and security concerns," the only venues for distributing materials in Loring Park during the Festival would be (1) Festival booths, which must be approved by Twin Cities Pride, (2) "Board-sponsored booth[s]" within Loring Park but outside the confines of the Festival, and (3) a "material drop area" within the Festival, where any person may leave noncommercial literature unattended. Consistent with the agreement, the Board later adopted a resolution that prohibits an attendee like Johnson from personally distributing literature in Loring Park during the Festival except from a booth.

The 2011 Festival proceeded according to the settlement and corresponding Board resolution. On a map of the 2011 Festival grounds, produced and distributed by Twin Cities Pride, the area designated for Board-sponsored booths contained an image of the word "Pride" in a red circle with a red line through it. Johnson dubs this a "No Pride Zone"; Twin Cities Pride says it used the image to indicate that the area was not part of the Festival; the Board responds that it had nothing to do with the design of the map and did not approve the inclusion of the symbol. Twin Cities Pride also placed a sign next to the material drop area stating that the area was for "individuals and groups that do not support the message of Twin Cities Pride"; the Board removed the sign during the Festival. In 2011, Johnson declined to seek a Board-sponsored booth and placed no literature in the drop area.

Johnson then brought this action, seeking relief that included a preliminary injunction against enforcement of the regulation on literature distribution. The case was assigned to a different judge than was the previous litigation. The court denied Johnson's motion, concluding that he had not shown a sufficient likelihood of success, because the regulation constitutes a content-neutral time, place, and manner restriction that is narrowly tailored to serve the Board's significant interest in crowd control. A panel of this court (Loken, Bye, and Gruender, JJ.) granted an injunction pending appeal in 2012, and this panel renewed that injunction in 2013.

II.

To resolve a motion for a preliminary injunction, the district court must consider (1) the threat of irreparable harm to the movant, (2) the balance between that harm and the injury that granting the injunction would inflict on other interested parties, (3) the probability that the movant will succeed on the merits, and (4) whether the injunction is in the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc). In a challenge to a federal statute, state statute, or other "government action based on presumptively reasoned democratic processes," the movant must show that he is "likely to prevail on the merits." *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 731-33 & n.4 (8th Cir. 2008) (en banc). We review Johnson's constitutional claims *de novo*, *United States v. Petrovic*, 701 F.3d 849, 854 (8th Cir. 2012), and "we are obliged to make a fresh examination of crucial facts." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 567 (1995).

The parties agree that Johnson's distribution of Bibles is protected speech, *see Murdock v. Pennsylvania*, 319 U.S. 105, 108-09 (1943), that Loring Park is a traditional public forum, *see, e.g.*, *Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 130 S. Ct. 2971, 2984 n.11 (2010), and that it remains so during the Festival. *Cf. Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 655 (1981) (considering ban on distribution of literature outside booths in a "limited public forum," where attendees paid for admission to state fairgrounds). The parties disagree about whether the restriction is content-based—that is, whether the challenged regulation treats speakers differently based on the content of their messages. *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984). The Board contends that the rule is content-neutral, because it limits "*all* distribution of literature in Loring Park during the Pride Festival except from a Pride sponsored booth or a Board sponsored booth," regardless of content. *See Saieg v. City of Dearborn*, 641 F.3d 727, 735 (6th Cir. 2011). Johnson counters that because the

-6-

Board knows that Twin Cities Pride exercises its right to condition Festival booths on agreement with its message, the Board's regulation "effectively carves out a content-based exception to its no-literature-distribution-within-the-festival policy." In other words, the Board's regulation means that only persons with viewpoints approved by Twin Cities Pride may distribute literature within the Festival. *Cf. Heffron*, 452 U.S. at 649 ("The method of allocating space is a straightforward first-come, first-served system. The Rule [prohibiting solicitation and distribution of literature] is not open to the kind of arbitrary application that this Court has condemned as inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view.").

Assuming the Board's regulation should be treated as content-neutral, we conclude that Johnson has demonstrated a likelihood of success on the merits. To justify a content-neutral restriction on the time, place, and manner of protected speech in a public forum, the Board must show that the restriction is "narrowly tailored to serve a significant governmental interest, and . . . leave[s] open ample alternative channels for communication of the information." *Clark*, 468 U.S. at 293. This narrow tailoring requirement means not only that the regulation must "promote[] a substantial government interest that would be achieved less effectively absent the regulation," *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989) (internal quotation omitted), but also that "the factual situation demonstrates a real need for the government to act to protect its interests." *Ass'n of Cmty. Orgs. for Reform Now v. St. Louis Cnty.*, 930 F.2d 591, 595 (8th Cir. 1991). In other words, it is not enough for the Board to recite an interest that is significant in the abstract; there must be a genuine nexus between the regulation and the interest it seeks to serve. *See United States v. Grace*, 461 U.S. 171, 182-83 (1983); *see also Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994) (plurality opinion).

The Board contends that restricting literature distribution to booths during the Festival is narrowly tailored to serve its significant interest in maintaining the orderly

flow of people, providing access for security and emergency vehicles, and facilitating the activities of the participants of the Festival. The Board points to an affidavit presented by the Executive Director of Twin Cities Pride, which describes an incident at the 2010 Festival when "a group of animal rights activists" distributed "graphic" literature depicting animal cruelty from outside a booth.

As evidence that congestion exists at the Festival more broadly, the Board cites past aggregate attendance statistics for the entire Pride Celebration (of which the Festival is only one event), and Twin Cities Pride's predicted attendance figures for the 2012 Festival. The Board relies on the Executive Director's assertions that "there were nine ambulance calls on one day of the 2011 Pride Festival," and that paths must be clear to allow for "the staging and delivery of supplies to food and beverage or other vendors." The Board thus reasons that the restriction on literature distribution serves the legitimate interest in crowd control, because literature distribution from outside of booths increases congestion and congestion impedes emergency, security, and delivery vehicles.

In the abstract, controlling crowds can constitute a significant governmental interest that bears directly on public safety. *See Heffron*, 452 U.S. at 650-51. We disagree with the district court, however, that the Board made a satisfactory showing that the literature distribution regulation is narrowly tailored to serve that interest in this instance.

The Board presented little evidence that forbidding literature distribution furthers a significant governmental interest at the Festival. The Board's reliance on the assertion by Twin Cities Pride's Executive Director that literature distribution causes congestion is insufficient. Her only specific evidence on the topic was that distribution of "graphic" literature related to animal cruelty in 2010 led to "complaints from participants because of the traffic congestion caused by these non-participants handing out literature from outside of a booth and because the participants themselves

were required to remain in their booths when handing out literature or materials." This affidavit suggests that above all the Festival participants were unhappy that their own literature distribution was confined to booths. It makes little sense for participants to have complained simultaneously that (1) literature distribution outside of booths caused problematic congestion, and (2) they too should have been permitted to distribute literature from outside their booths, thereby creating more problematic congestion. The Executive Director's averment is at best ambiguous, and the Board offered no other evidence to show a real need to prohibit literature distribution on account of congestion. *Cf. Saieg*, 641 F.3d at 737 (concluding that city's interest in curtailing expression on sidewalks was "not substantial," where sidewalks remained open to the public during a festival, and were not restricted to attendees paying an admission fee as in *Heffron*).

The regulation is also underinclusive. Where a regulation restricts a medium of speech in the name of a particular interest but leaves unfettered other modes of expression that implicate the same interest, the regulation's underinclusiveness may "diminish the credibility of the government's rationale for restricting speech in the first place." *City of Ladue v. Gilleo*, 512 U.S. 43, 52 (1994). In other words, "[u]nderinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown v. Entm't Merch. Ass'n*, 131 S. Ct. 2729, 2740 (2011).

Johnson produced evidence that the Board permitted at least one street performer on the pathways in Loring Park during the 2011 Festival. The district court accepted that performers are permitted in the park during the Festival, but concluded nonetheless that the literature distribution regulation is "not so underinclusive as to be unconstitutional," because performers are less likely to cause congestion than literature distributors. We think it obvious, however, that a street performer's very purpose is to draw a crowd. Buskers like mimes, musicians, and living statues aim to attract an audience, and passersby must stop to listen or observe. With literature

distribution, by contrast, a recipient "need not ponder the contents of a leaflet or pamphlet in order mechanically to take it out of someone's hand." *United States v. Kokinda*, 497 U.S. 720, 734 (1990) (plurality opinion). "'The distribution of literature does not require that the recipient stop in order to receive the message the speaker wishes to convey; instead, the recipient is free to read the message at a later time.'" *Id.* (quoting *Heffron*, 452 U.S. at 665 (Blackmun, J., concurring in part and dissenting in part)); *see United States v. Belsky*, 799 F.2d 1485, 1489 (11th Cir. 1986) ("A passerby can take a pamphlet and keep walking.").

At oral argument before this court, the Board asserted that if performers created a crowding problem during the Festival, then Board officials would "move them on" to alleviate the congestion. But if this approach suffices to cure congestion created by entertainers who seek to attract crowds, then we fail to see why a similar exhortation would not be sufficient to alleviate any crowding caused by a stationary distributor of literature. That the Board is satisfied with informal case-by-case action with respect to performers but insists on a blanket ban on distribution of literature outside booths diminishes the credibility of its asserted rationale.

We note also that Twin Cities Pride's permit application for the 2012 Festival said the organization would be collecting money in connection with the Festival, and explained that "volunteers will be near entrances to request donations for MN United—the campaign to defeat the marriage amendment." The Board issued a permit for the 2012 Festival, and nothing in the record or submissions of the parties indicates that the permit was conditioned on Twin Cities Pride's abandoning its proposed solicitation.

Solicitation is a more disruptive form of speech than literature distribution. "'Solicitation requires action by those who would respond: The individual solicited must decide whether or not to contribute (which itself might involve reading the solicitor's literature or hearing his pitch), and then, having decided to do so, reach for

a wallet, search it for money, write a check, or produce a credit card.'" *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 683 (1992) (quoting *Kokinda*, 497 U.S. at 734). Solicitation thus impedes the normal flow of traffic, *id*. at 684, whereas literature distribution need not, *id*. at 690 (O'Connor, J., concurring in part and dissenting in part), and the Supreme Court in one instance approved a ban on solicitation while invalidating a prohibition on distribution of literature. *Id.* at 685; *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 830, 831 (1992) (per curiam). If the Board approves of stationary solicitors raising money outside booths and "near entrances" to the Festival, then we are hard pressed to understand how it can justify barring Johnson from engaging in a less congestive form of expression at the same locations.

For these reasons, we conclude that Johnson has shown on this record a likelihood of success on his claim that the literature distribution regulation is not narrowly tailored to serve a significant governmental interest. Johnson also satisfies the requirement of irreparable harm, because a "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion). The balance of equities favors granting the injunction, and the injunction is in the public interest. *See Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012) (en banc). We therefore reverse the district court's denial of Johnson's motion for a preliminary injunction and remand for further proceedings.

BYE, Circuit Judge, dissenting.

In my view, the Board's regulation was a content-neutral time, place, and manner restriction and was narrowly tailored to serve a significant government interest which also provided ample alternative channels of communication. I would affirm the judgment of the district court.

First, I believe the Board demonstrated a significant government interest in restricting literature distribution during the Festival to maintain the orderly flow of people, provide access for security and emergency vehicles, and facilitate Festival activities. The Supreme Court has recognized a state's interest in protecting the safety and convenience of persons using a public forum. See Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 650 (1981).

In Heffron, members of the Krishna religion desired to distribute literature on the fairgrounds during the Minnesota State Fair. Id. at 642-43. A fairgrounds rule mandated such literature be distributed only from fixed locations. Id. at 643. Like the policy at issue in this case, "the Rule d[id] not prevent organizational representatives from walking about the fairgrounds and communicating the organization's views with fair patrons in face-to-face discussions," but required literature be distributed from a booth. Id. at 643-44. With respect to the significance of the governmental interest involved, the Court held "[b]ecause the Fair attracts large crowds, it is apparent that the State's interest in the orderly movement and control of such an assembly of persons is a substantial consideration. As a general matter, it is clear that a State's interest in protecting the 'safety and convenience' of persons using a public forum is a valid governmental objective." Id. at 650.

In my view, the Board's interest is indistinguishable from the interest identified in Heffron. Allowing any and all participants to distribute literature outside a booth would impede arrival and access of other Festival attendees, as well as paramedics, security personnel, police, and the delivery of supplies to Festival vendors. Highlighting the need for such access is the fact that there were nine ambulance calls to the Festival on one day. The Board also noted a past incident in which the distribution of literature outside of booths caused pedestrian congestion, security problems, and complaints from participants.

The majority criticizes the participants "who complained simultaneously that (1) literature distribution outside of booths caused problematic congestion, and (2) they too should have been permitted to distribute literature from outside their booths, thereby creating more problematic congestion." However, instead of undercutting the Board's position, such complaints highlight the real tension faced by the Board. If one person is allowed to ignore sensible regulations limiting literature distribution to designated areas, more people will have an incentive to ignore the same regulations. Such will lead to greater congestion and a frustration of all participants' free speech activity, especially the Festival participants who went to the trouble of obtaining and operating a booth within the regulations. Indeed, this outcome could lead to less speech, not more.

The majority has concluded the regulation is underinclusive because the Board permitted at least one street performer on the pathways in 2011, though at oral argument, counsel for the Board asserted the Board was unaware of any performers at the Festival. The majority then speculates as to street performers being more likely to cause congestion than literature distributors even though it is unclear whether a street performer has ever caused congestion or other problems in previous years. On the other hand, the Festival has encountered problems with literature distributors in the past and has developed a sensible plan for managing those situations. It is unfair to expect the Board to have a plan in place to address a problem which has never materialized.

The majority also criticizes the Festival's efforts to collect donations in 2012, reasoning such "[s]olicitation is a more disruptive form of speech than literature distribution." However, no such evidence was presented that these solicitors caused or would cause congestion or other similar problems. Solicitation was limited to designated areas "near entrances," which is a sensible limitation.

Next, in my view, the Board's regulation is narrowly tailored to serve its significant government interest. In order to meet the narrowly tailored requirement, a restriction on speech must not "burden substantially more speech than is necessary to further the government's legitimate interest." Ward v. Rock Against Racism, 491 U.S. 781, 799 (1989). "[W]hen a content-neutral regulation does not entirely foreclose any means of communication, it may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means of serving the [government's] goal." Hill v. Colorado, 530 U.S. 703, 726 (2000).

Here, Johnson is not prevented from distributing literature during the Festival – he is merely restricted to doing so at designated locations. As the Supreme Court has noted, "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." Heffron, 452 U.S. at 647. Like the Heffron policy, the Board's regulation permits Johnson – and anyone else – to walk about the park, engage in conversations with festival-goers, and wear clothing or carry a sign displaying any message he desires. It merely limits one type of activity (i.e., the distribution of materials) to a fixed location (i.e., literature drop area), which was made available to any interested party and located adjacent to the Festival area.

Finally, my belief is the Board has provided ample alternative channels of communication. Johnson can attend the Festival, engage in conversations with other attendees, wear expressive clothing, carry a sign conveying his message, and distribute Bibles from both the "materials drop" booth within the park and from his own booth outside the Festival. Johnson argues his preferred form of speech is personally handing a Bible to someone in the Festival, but the fact that one method of communication is preferred does not render alternatives necessarily inadequate. See Members of City Council of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 812 (1984) ("To the extent that the posting of signs on public property has advantages over [other]

-14-

forms of expression, there is no reason to believe that these same advantages cannot be obtained through other means.").

Weighing these factors, I do not believe Johnson has demonstrated a likelihood of success on the merits of his claim and, thus, is not entitled to injunctive relief.

For the foregoing reasons, I respectfully dissent.

_____