MELLOY, Circuit Judge,
concurring in part and dissenting in part.
The majority holds that the entire Plaza Area is a nonpublic forum and, thus, the Exterior Access and Use Policy is reason? able. I would hold that only part of the Plaza Area is a nonpublic forum; the section of the Plaza Area directly in front of the pedestrian bridge, however, .is.a tradi *738 tional public forum. Accordingly, I concur in part and dissent in part.
A traditional public forum is property the government has historically kept open for public discourse, including parks, streets, and sidewalks. See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 802, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985); see also Bowman v. White, 444 F.3d 967, 975 (8th Cir. 2006). “A traditional public forum is a type of property that ‘has the physical characteristics of a public thoroughfare, ... the objective use and purpose of open public access or some other objective use and purpose inherently compatible with expressive conduct, [and] historically] and traditionally] has been used for expressive conduct....'" Bowman, 444 F.3d at 975 (alterations in original) (quoting Warren v. Fairfax Cty., 196 F.3d 186, 191 (4th Cir. 1999)). A nonpublic forum, in contrast, is “[p]ublic property which is not by tradition or designation a forum for public communication.” Perry Educ. Ass’n v. Perry Local Educators’ Ass’n, 460 U.S. 37, 46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983).
Based on the physical characteristics and the traditional and objective use of the Plaza Area, and the government’s intent with respect to the Plaza Area, see Bowman, 444 F.3d at 978, the facts of this case show that the Plaza Area cannot be labeled as only one type of forum. Although a majority of the Plaza Area surrounding the entrance to the Arena is a nonpublic forum for the reasons discussed by the majority, the Plaza Area leading from the pedestrian bridge to the sidewalk is a traditional public forum.
To the east of the Arena, there is a pedestrian bridge that is held open to the public. The bridge feeds directly into the Plaza Area; there is no separation between the bridge and the Plaza Area. The bridge is commonly used to access the Haymarket district and to move between the baseball stadium, the Arena, and the Haymarket district. The bridge also connects to a parking lot regularly held open to the public. The public can park in the lot and walk over the bridge and must walk through the Plaza Area to get to the Haymarket district.
Discussing the physical features of the Plaza Area, the majority notes, ante, at 733, that “[t]he surface of the Plaza Area is composed of colored and patterned concrete, as well as by brick-like pavers, all of which generally distinguish the Plaza Area from the adjacent public sidewalks.” True, the Plaza Area does have colored and patterned concrete and brick-like pavers. However, the colored concrete and pavers do not clearly distinguish the part of the Plaza Area that is open to the public. Rather, a review of the images submitted shows that the colored concrete is not limited to the Plaza Area; the colored concrete continues past the bollards onto the public sidewalk.
Further, an individual using the pedestrian bridge must cross through the Plaza Area to reach the rest of the Haymarket district. The majority, ante, at 732, states, “Although the pedestrian bridge ends near the Plaza Area, pedestrians need not enter or pass through the Plaza Area to access other areas of the Haymarket district.” The majority reaches this conclusion because the Policy excludes a strip of land along the edge of the Plaza Area that pedestrians are permitted to walk on to access the Haymarket district. But there are no physical markers or barriers to indicate that such a perimeter exists. Rather, to indicate this perimeter, the Policy super-imposes an orange line on pictures of the Plaza Area. And the colored concrete the majority says distinguishes the Plaza Area from the public sidewalk does not align with this perimeter. In fact, *739 the image included with the Policy itself shows that the path excluded from the Policy includes both the colored and uncolored concrete.
A close look at the image in the majority opinion, ante, at 728, may be helpful. In the upper right comer of the image there are two parallel lines, one of which runs along the perimeter line. The space between those lines is the pedestrian bridge. As the image shows, the perimeter is almost flush with the end of the bridge. To avoid the Plaza Area covered by the Policy, one must turn and walk to the left immediately upon exiting the bridge.
Finally, the placement of the colored concrete supports a finding that the section of the Plaza Area leading from the bridge to the sidewalk is a traditional public forum. There is a strip of colored concrete where the bridge meets the Plaza Area that is the same width as the bridge. That colored concrete leads across the Plaza Area to the sidewalk. In Hodge v. Talkin, 799 F.3d 1145, 1158 (D.C. Cir. 2015), the court explained that the Supreme Court plaza was architecturally integrated with the Supreme Court building and, “[f]rom the perspective of a Court visitor (and also the public), the physical and symbolic pathway to [the Supreme Court] chamber begins on the plaza.” (second alteration in original) (citation and internal quotation marks omitted). By contrast, here, from the perspective of a pedestrian using the bridge, the colored concrete acts as a “physical and symbolic pathway” to and from the sidewalk.
Although I would hold that this section of the Plaza Area has the physical characteristics of a public forum, “[p]ublicly owned or operated property does not become a ‘public forum’ simply because members of .the public are permitted to come and go at will.” Bowman, 444 F.3d at 978 (alteration in original) (quoting United States v. Grace, 461 U.S. 171, 177, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983)). I do not disagree with the majority, ante, at 735, that “the Plaza Area is used as the forecourt or entryway to the Arena, and it facilitates patrons’ safe and efficient passage into and out of the Arena,”, or that it “serves as additional commercial space for use by Arena Tenants.” I would, however, limit those conclusions to the Plaza Area between the Arena and the west side of the bridge and the strip of colored concrete.
It is undisputed that people who use the pedestrian bridge also use the Plaza Area. And, in his deposition, Tom Lorenz, an SMG official, stated that' the Plaza Area can be used regularly by the public for purposes other than entering and exiting the Arena. Additionally, it is undisputed that the pedestrian bridge is open to the public and meant to connect the parking lot to the Arena and the Haymarket district. Finally, it is undisputed that pedestrians must cross at' least part of the Plaza Area to reach the street. As such, the Plaza Area invites the public to pass through and “operate[s] as a public artery.” See Hotel Emps. & Rest. Emps. Union, Local 100 v. City of N.Y. Dep’t of Parks & Rec., 311 F.3d 534, 552 (2d Cir. 2002). Further, the Plaza Area is used in the manner cited by the majority only during events, while public passage through the Plaza Area occurs whenever people park in that parking lot to go to the Haymarket district. As a result, it is difficult to conclude that the entire Plaza Area’s primary purpose is for Arena use.
Finally, considering the City’s intent, purpose, and policy, the majority, ante, at 735, states that “the record establishes that the City’s principal purpose with respect to the Plaza Area has been to protect the contractual rights of Arena Tenants, to allow for crowd management and safety, to *740 provide a forecourt or gathering place for Arena patrons, and to provide an area for security screening,” I disagree. The first instance of the Plaza Area being used for security screening was in February 2016, nearly three years after the Arena opened. Additionally, as previously noted, the pedestrian bridge was intended to connect pedestrians to the Arena and the Hay-market district, the only way to get from the bridge to the Haymarket district is to cross through at least part of the Plaza Area, and both the bridge and the sidewalk along the Plaza Area are public. Thus, the logical inference is that the City intended that at least part of the Plaza Area be incorporated into the “transportation grid and ... open to the public for general pedestrian passage.” United Church of Christ v. Gateway Econ. Dev. Corp. of Greater Cleveland, 383 F.3d 449, 452 (6th Cir. 2004).
Based on the foregoing discussion, I would hold that the part of the Plaza Area between the pedestrian bridge and the sidewalk is a traditional public forum. I agree with the majority as to the rest of the Plaza Area.
Because I would hold that the part of the Plaza Area- between the pedestrian bridge and the sidewalk is a traditional public forum, I turn to the question of whether the Policy is permissible with respect to that part of the Plaza Area. I agree with the majority that the Policy is reasonable with respect to the part of the Plaza Area I would hold to be a nonpublic forum. In a traditional public forum, however, we apply a different level of scrutiny and the government’s ability to restrict speech is the most limited. Bowman, 444 F.3d at 975. Strict scrutiny applies to content-based restrictions: the regulation must be necessary to serve' a compelling state interest and be narrowly tailored to that interest. Id. Alternatively, a content-neutral, time, place, or manner restriction must be “narrowly tailored to serve a significant government interest and leave[] open ample alternative channels of communication.” Id.
I agree with the majority, ante, at 736, “that the Policy is viewpoint neutral on its face, broadly prohibiting specific expressive activity inside the Arena and the Policy Zone without regard to the content of the speech.” Thus, with respect to the part of the Plaza Area I would hold is a public forum, the Policy will. pass, constitutional muster if “the factual situation demonstrates a. real need for the government to act to protect its interests.” Johnson v. Minneapolis Park & Rec. Bd., 729 F.3d 1094, 1099 (8th Cir. 2013) (quoting Ass’n of Cmty. Orgs. for Reform Now v. St. Louis Cty., 930 F.2d 591, 595 (8th Cir. 1991)). “In other words, it is not enough for the [government] to recite an interest that is significant in the abstract; there must be a genuine nexus between the regulation and the interest it seeks to serve.” Id.
Appellees contend that the Policy is narrowly tailored to serve three interests: (1) to prevent sales and solicitations that compete with tenants’ use of the Plaza Area; (2) to ensure safety and crowd management; and (3) to keep the Plaza Area open for security screening.
“In the abstract, controlling crowds can constitute a significant governmental interest that bears directly on public safety.” Id. at 1100; see also Heffron v. Int’l Soc’y for Krishna Consciousness, Inc., 452 U.S. 640, 650, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981) (“Because the Fair attracts large crowds, it is apparent that the State’s interest in the orderly movement and control of such an assembly of persons is a substantial consideration. As a general matter, it is clear that a State’s interest in protecting the ‘safety and convenience’ of persons using a public forum is a valid governmental ■ objective.” (citation omitted)). Appel- *741 lees, however, have presented little evidence that prohibiting solicitations and public communications furthers that interest. It is true that certain events at the Arena draw crowds of 12,000 to 15,000 people. However, the assertion that the expressive activities restricted by the Policy cause congestion near the entrance to the Arena is insufficient. See Johnson, 729 F.3d at 1100. Appellees have not submitted any evidence that individuals handing out leaflets have actually caused increased congestion. Additionally, Ball would not have violated the policy if he stood in the Plaza Area and preached at the crowd without also passing out leaflets. And the Plaza Area remains open to the public during events at the Arena. Cf. id. (citing Saieg v. City of Dearborn, 641 F.3d 727, 737 (6th Cir. 2011) (con'cluding'that city’s interest in curtailing expression on sidewalks was “not substantial,” where sidewalks remained open to the public during a festival, and were not restricted to attendees paying an admission fee)).
Further, the Policy is underinclusive. “Where a regulation restricts a medium of speech in the name of a particular interest but leaves unfettered other modes of expression that implicate the same interest, the regulation’s underinelusiveness may ‘diminish the credibility of the government’s rationale for restricting speech in the first place.’ ” Id. (quoting City of Ladue v. Gilleo, 512 U.S. 43, 52, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994)), In this case, the Policy does not prohibit an individual from standing in the Plaza Area and preaching. Nor does it prohibit street performers from performing in the Plaza Area. Arguably, these activities are more likely to draw crowds than someone passing out literature. See id. at 1101 (“We think it obvious, however, that'-a street performer’s very purpose is to draw a crowd. Buskers like mimes, musicians, and living statues aim to attract an- audience, and passersby must stop to listen or observe. With literature distribution, by contrast, a recipient ‘need not ponder the contents of a leaflet or pamphlet in order mechanically to take it out of someone’s hand.’ ” (quoting United States v. Kokinda, 497 U.S. 720, 734, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990) (plurality opinion))).
Finally, the Policy is not narrowly tailored because solicitations and public communications are prohibited in the Plaza Area at all times; the Policy does not restrict those expressive activities solely when there is an event at the Arena. The Policy would be more narrowly tailored to serve Appellees’ stated interests if it applied during events only.
As a result, I would hold that the Policy does not pass constitutional muster with respect to the part of the Plaza Area between the pedestrian bridge and the Hay-market district. The fact that there are alternative channels of communication, including the sidewalk just outside the Plaza Area, cannot cure the Policy’s underinclu-siveness and failure to be narrowly tailored. Accordingly, I would affirm the district court in part, and reverse and remand in part.