# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-1350

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | Appeal from the United States |
| | * | District Court for the |
| v. | * | Western District of Missouri. |
| | * | |
| Tony R. Nenninger, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted:   September 9, 2003

Filed:   December 5, 2003

_____

Before WOLLMAN, BOWMAN, and RILEY, Circuit Judges.

_____

BOWMAN, Circuit Judge.

After a trial held before a Magistrate Judge, Tony R. Nenninger was convicted of two federal misdemeanors: using and occupying National Forest System land as part of a group of seventy-five or more persons without special-use authorization and constructing a water line on National Forest System land without special-use authorization. See 16 U.S.C. § 551 (1994); 36 C.F.R. §§ 261.10(a), (k) (1997). He was fined fifty dollars for each conviction. See United States v. McFadden, 71 F. Supp. 2d 962 (W.D. Mo. 1999) (opinion of Mag. J. England). Nenninger's

conviction was affirmed on appeal by the District Court,[1] see 18 U.S.C. § 3402 (2000), and he now appeals, urging that his conviction violated his First Amendment rights. We affirm.

This case arises out of a Spring 1998 gathering of the Rainbow Family in the Eleven Point district of the Mark Twain National Forest in Southern Missouri.[2] Forest Service Rangers met with several of the participants, including Nenninger, on April 27, 1998. The purpose of the meeting was to discuss the logistics for the gathering, including the necessity of obtaining a special-use authorization for a group larger than seventy-five persons and permits in order to erect any water lines. The Rangers prepared a site plan as part of the special-use authorization, delivered the documents to the encampment on May 1, and left instructions for a group member to sign and return the papers to their office. No one from the Rainbow Family ever

---

[1]The Honorable Fernando J. Gaitan, Jr., United States District Judge for the Western District of Missouri.

[2]The Rainbow Family (or Rainbow People) has been described as:

> an unincorporated, loosely-structured group of individuals that regularly gathers in undeveloped sites in National Forests to "pray for peace, discuss environmental and other contemporary political and social issues, and [to] exchange, develop[,] express and demonstrate their ideas and views." Annual gatherings have occurred in different National Forests on and around July 4 since 1972. These gatherings draw more than 20,000 participants and last for a month or more.

Black v. Arthur, 18 F. Supp. 2d 1127, 1130 (D. Or. 1998) (quoting Rainbow Family's complaint), aff'd, 201 F.3d 1120 (9th Cir. 2000). The Rainbow Family's annual gatherings have been described as "a reunion in the woods commemorating and attempting to re-create the 1960s with all the love and loving, communing with nature, rejecting authority, accepting substances, and indulging appetites that made up the best and the worst of that era." David B. Sentelle, Judge Dave & the Rainbow People, 3 Green Bag 2d 61, 62 (1999).

signed the special-use authorization, and when the Rangers returned on May 5, they determined there were at least ninety to ninety-five persons, and perhaps as many as 500 people, present. Nenninger previously left the site for two to three days because he was worried that he might be targeted for prosecution for failing to sign the authorization, something he had not done because he did not feel he possessed the authority to sign the permits on behalf of the group. He returned on May 6 and presented himself to the Forest Service Rangers, who cited him and two other individuals for various violations. The charges against one of Nenninger's co-defendants were dismissed and another of his co-defendants pleaded guilty. Nenninger unsuccessfully moved to dismiss the two-count information alleging several violations of his First Amendment rights. He was convicted of both misdemeanors and appealed to the District Court where he again raised several of the same First Amendment claims and raised other claims as well. The District Court affirmed his conviction. Nenninger now appeals and raises several First Amendment claims.

In April and May 1998, when this case arose, several regulations governed group gatherings of more than seventy-five persons on Forest Service land. The Forest Service regulations make it illegal to "[u]se or occup[y] . . . National Forest System land or facilities without special-use authorization when such authorization is required." 36 C.F.R. § 261.10(k) (1997). Section 251.50(c) explains that no special-use authorization is required for "noncommercial recreational activities" unless the entity involved is a "noncommercial *group*." Id. § 251.50(c) & (c)(3) (emphasis added). A "group use" within the meaning of the Forest Service regulations is "an activity . . . that involves a group of 75 or more people, either as participants or spectators." Id. § 251.51. If a group applies for a special-use authorization, "[a]n authorized officer shall grant an application" after the officer determines that:

(i) Authorization of the proposed activity is not prohibited by [certain federal regulations] or by Federal, State, or local law unrelated to the content of expressive activity;

(ii) Authorization of the proposed activity is consistent or can be made consistent with standards and guidelines in the applicable forest land and resource management plan . . .

(iii) The proposed activity does not materially impact the characteristics or functions of the environmentally sensitive resources or lands identified in [the] Forest Service Handbook . . .

(iv) The proposed activity will not delay, halt, or prevent administrative use of an area by the Forest Service or other scheduled or existing uses or activities on National Forest System lands . . .

(v) The proposed activity does not violate state and local public health laws and regulations as applied to the proposed site. . . .

(vi) The proposed activity will not pose a substantial danger to public safety. . . .

(vii) The proposed activity does not involve military or paramilitary training or exercises by private organizations or individuals . . .

(viii) A person or persons 21 years of age or older have been designated to sign and do sign a special[-]use authorization on behalf of the applicant.

Id. § 251.54(h)(1). Finally, § 251.56 governs the terms and conditions that must be included in a special-use authorization, and this regulation permits the granting officer to add "[s]uch terms and conditions as the authorized officer deems necessary to . . . (vii) otherwise protect the public interest." Id. § 251.56(a)(2)(vii).

On appeal, Nenninger argues that his prosecution was unconstitutional and that his motion to dismiss the information should have been granted. Specifically, he urges that his prosecution violated his First Amendment right *not* to associate with others. He also challenges the validity of the underlying regulations. We review the denial of Nenninger's motion to dismiss these misdemeanor charges de novo. United States v. Smith, 171 F.3d 617, 619 (8th Cir. 1999).

First, Nenninger urges that his First Amendment right not to associate with others was violated because he was cited for—but not charged with, prosecuted for, or convicted of—refusing to sign a special-use authorization for the Rainbow Family gathering. Cf. Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc., 515 U.S. 557, 573–74 (1995). We assume, arguendo, that if Nenninger had been convicted of refusing to sign the special-use authorization on behalf of the Rainbow Family, constitutional difficulties would confront that conviction. But Nenninger was not indicted on, prosecuted for, or convicted of this charge and therefore we need not, and do not, address his arguments concerning this charge.

Second, Nenninger argues, as he did in the trial court and on appeal in the District Court, that the regulation governing the issuance of the special-use authorizations is overbroad and facially invalid because it allows the issuing Forest Service officer to attach "[s]uch terms and conditions as the authorized officer deems necessary to . . . *otherwise protect the public interest*." 36 C.F.R. § 251.56(a)(2)(vii) (1997) (since amended) (emphasis added), and that such a term or condition could chill First Amendment activity. If this regulation is invalid, he argues, then his conviction for using and occupying Forest Service Land as part of a group that did not have the requisite special-use authorization cannot stand. We reject his argument that the regulation is invalid.

Nenninger brings a facial challenge; a type of claim that is "generally disfavored." FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 223 (1990); see also Broadrick v. Oklahoma, 413 U.S. 601, 613 (1973) (noting that the overbreadth doctrine is "strong medicine. It has been employed by the Court sparingly and only as a last resort"). In City of Lakewood v. Plain Dealer Publishing Co., 486 U.S. 750 (1988), the Supreme Court set out a two-part test that acts as a gatekeeper for facial challenges based on the First Amendment's overbreadth doctrine. For such a challenge to be viable, the law or regulation in question must confer "substantial power to discriminate based on the content or viewpoint of speech by suppressing

disfavored speech or disliked speakers." <u>Id.</u> at 759. In addition, "[t]he law must have a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of the identified censorship risks." <u>Id.</u> Without deciding whether the regulation in question does "have a close enough nexus to expression" to permit a facial challenge, <u>see</u> <u>Virginia v. Hicks</u>, 123 S. Ct. 2191, 2199 (2003) ("Rarely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech . . . ."), we must reject Nenninger's challenge because the regulations do not confer "substantial power to discriminate based on the content or viewpoint." <u>Lakewood</u>, 486 U.S. at 759.

Nenninger's claim rests heavily on <u>United States v. Linick</u>, 195 F.3d 538 (9th Cir. 1999), where the court affirmed the dismissal of an information that charged two Rainbow Family members with crimes similar to those with which Nenninger was charged. That court determined that § 251.56(a)(2)(vii)'s language (the same at issue here) was impermissibly broad and violated the First Amendment because it allowed the Forest Service "to invoke its authority . . . to impose such onerous terms on the use of public land by certain groups so as to render impractical their use of the land for expressive activities." <u>Linick</u>, 195 F.3d at 542; <u>but see,</u> <u>United States v. Kalb</u>, 234 F.3d 827, 835 (3d Cir. 2000), <u>cert. denied</u>, 534 U.S. 1113 (2002), (rejecting facial challenge to same regulations). Accordingly, the court determined "that 36 C.F.R. § 251.56(a)(2)(vii) vests the Forest Service with unbridled discretion to deny expressive activity and is therefore overbroad on its face." We reject Nenninger's overbreadth claim and his reliance on <u>Linick</u> because a 1995 administrative statement narrowed the reach of these regulations.

In <u>Linick</u>, the court held that § 251.56(a)(2)(vii) was invalid as applied to the defendants. The court also held that a 1999 Forest Service interpretive rule saved the regulation by clarifying the scope of the provision and limiting "public interest" to "the need to address concerns of public health and safety, to minimize damage to the

National Forest System resources, and to allocate space among actual or potential uses and activities." Land Uses; Noncommercial Group Use Permit Approval, 64 Fed. Reg. 48959 (Sept. 9, 1999) (quoted in Linick, 195 F.3d at 542). But, the Linick court did not address earlier Forest Service statements made when the agency published amended regulations in response to United States v. Rainbow Family, 695 F.Supp. 294 (E.D. Tex. 1988) (holding that an earlier version of these regulations violated the First Amendment because they distinguished between expressive conduct and other forms of conduct) and other Rainbow Family cases. When it promulgated the amended regulations in 1995, the Forest Service explicitly addressed concerns about its ability to discriminate against expressive conduct. See Land Uses and Prohibitions, 60 Fed. Reg. 45257, 45259 (Aug. 30, 1995). More importantly, the Forest Service expressly noted that its regulations were designed to comply with the applicable law and that the "public interest" it sought to protect in these regulations referred only to public health and safety, preserving National Forest lands, and allocating space among different groups and uses. E.g., id. at 45260, 45262, 45265, 45266. The specificity of the notice is striking. In response to comments from members of the Rainbow Family, the Forest Service stated:

> The intent of this rule is not to break up or prohibit any group uses, including Rainbow Family Gatherings. Rather, the intent of this rule is to control or prevent harm to forest resources, address concerns of public health and safety, and allocate space. In United States v. Israel and United States v. Rainbow Family, the Forest Service was not attempting to prohibit the Rainbow Family Gathering, but rather to enforce existing group use regulations where the Rainbow Family had failed to obtain a special[-]use authorization.

Id. at 45265. Although there is some added specificity to the 1999 interpretive rule, the difference between these two statements is not of constitutional moment. Rather, the two statements establish that the Forest Service has been consistent in its interpretation of these regulations; if constitutional, that interpretation is entitled to

our deference. See, e.g., NLRB v. Bell Aerospace Co., 416 U.S. 267, 274–75 (1974). Because we must take into account any construction of a law that narrows its application, we reject Nenninger's challenge in light of the consistent interpretation the Forest Service has given the regulation in question. Lakewood, 486 U.S. at 770 n. 11.[3]

Nenninger also argues that the regulations requiring that noncommercial groups obtain and sign a special-use application are not valid time, place, and manner regulations. See 36 C.F.R. §§ 251.50(c), 251.54(h)(1)(viii), 251.61, 261.10(k) (1997). We disagree. Time, place, and manner restrictions on expressive conduct are valid if the law or regulation is content-neutral, is "narrowly tailored to serve a significant governmental interest, and . . . leave[s] open ample alternative channels for communication of the information." Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 (1984). Neither the requirement that groups of more than seventy-five persons obtain a permit, nor the requirement that the permit be signed is invalid. See United States v. Johnson, 159 F.3d 892, 895–96 (4th Cir. 1999) (rejecting claim that special-use authorization requirement was invalid time, place, and manner regulation). The regulations and the Forest Service's interpretive statements are content-neutral and no claim has been made that these regulations are not uniformly applied. The rule, which applies to groups large enough to do damage to the Forest Service lands and to exclude others from the area they occupy, is designed to serve significant government interests—protecting public health and safety, preserving National Forest lands, and allocating space among different groups and uses. See Clark, 468 U.S. at 297–98. Finally, the regulations leave ample alternative channels for expressive activity. If the Rainbow Family wishes to avoid the special-use authorization requirement, they may hold their gatherings on private property or other

_____

[3]Also, § 251.54(h)(1)(i) implicitly forbids denying special-use authorizations based on laws that are "[]related to the content of expressive activity." This prohibition supports our conclusion that the Forest Service personnel may not use public interest as a pretext for suppressing expressive activity.

lands.  If they wish to gather en masse in the National Forests, they must obtain a special-use authorization.[4]

For the reasons stated, the judgment of the District Court is affirmed.

———————————————————

---

[4]Nenninger also urges that the regulations were complied with because the conditions specified in the group's special-use authorization—which was filled out and approved by the Forest Service, but never signed—were substantially complied with.  He then claims, citing United States v. O'Brien, 391 U.S. 367, 377 (1968) (explaining four-part test for validity of government regulations that incidentally burden free speech), that, insofar as the only missing item was a signature, the regulations are unreasonable and violate the First Amendment because they force unassociated Rainbow Family members to associate with one another.  We disagree and we are satisfied that the signature requirement does not violate the test set forth in O'Brien.

In addition, Nenninger contends that the regulations are void for vagueness because Forest Service Rangers are given insufficient guidance as to "what constitutes a 'group' for the purposes of the permit requirement."  Reply Brief at 19.  Section 251.51 defines a "group use" as "an activity . . . that involves a group of 75 or more people, either as participants or spectators."  We see no ambiguity in the common word "group," which is usually given to mean "[a] number of persons or things regarded as forming a unity on account of any kind of mutual or common relation, or classed together on account of a certain degree of similarity."  6 Oxford English Dictionary 887 (2d ed. 1989).  We therefore reject this claim.