# United States Court of Appeals

## For the Eighth Circuit

_____

No. 16-3377

_____

Josephine Havlak Photographer, Inc.; Josephine Havlak

*Plaintiffs - Appellants*

William Joseph Hill; Mary Katherine Hill

*Plaintiffs*

v.

Village of Twin Oaks; Kathy Runge, Village of Twin Oaks Clerk/Controller in her official capacity only

*Defendants - Appellees*

John Belmar, St. Louis County Police Chief in his official capacity only

*Defendant*

------------------------------

International Municipal Lawyers Association; Minneapolis Park and Recreation Board

*Amici on Behalf of Appellee(s)*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

_____

Before SMITH, Chief Judge, ARNOLD and SHEPHERD, Circuit Judges.

_____

SMITH, Chief Judge.

The Village of Twin Oaks ("The Village") passed a municipal ordinance prohibiting all commercial activity in its neighborhood park without a permit. A commercial photographer, Josephine Havlak, sued the Village for injunctive and declaratory relief on behalf of herself and her business, Josephine Havlak Photographer, Inc. Havlak alleged that the ordinance violates her Free Speech rights guaranteed by the First Amendment of the United States Constitution. The district court[1] denied her claims, and we affirm.

## I. *Background*

The Village is a community of approximately 400 residents in Saint Louis County, Missouri. It has a five-member Board of Trustees ("the Board"), which administers the legislative and policymaking functions of the community. Too small to operate its own police department, the Village contracts with Saint Louis County ("County") to provide police services. The County regularly assigns Officer Mike Maxwell to the Village for 40 hours per week. Officer Maxwell responds to calls, writes speeding tickets, and provides other municipal policing services. When it needs additional police support, the Village contracts directly with Officer Maxwell and other officers at an hourly rate.

_____

[1]The Honorable Audrey G. Fleissig, United States District Judge for the Eastern District of Missouri.

In 1994, the Village dedicated an 11-acre public park in the middle of the community; the park includes a walking trail, lake, waterfall, gazebo, bridge, playground, and sporting amenities. To protect this new resource, the Board enacted a comprehensive ordinance prohibiting, among other things, motorized vehicles, hunting, all commercial activity, and the obstruction of walkways. In 2011, the Village upgraded the park's playground equipment, and the park experienced a dramatic increase in visitors—including a large number of commercial photographers. Because of the gazebo, waterfall, bridge, and other garden structures, one photographer referred to the park as presenting "a lot of good photo opportunities in a small area."

Commercial photographers (as many as eight at a time) and their subjects began competing for shooting locations within the park. Wedding parties would congregate for photos on the park bridge. Photo subjects would occupy the park restroom facilities, using them as dressing rooms. Some photographers would even set up outdoor studios in the park for shooting multiple subjects in an assembly-line fashion. In reaction to this increased traffic and in response to the Village residents' complaints, the Board erected signs notifying photographers of the longstanding ordinance prohibiting commercial activity within the park. Havlak filed this lawsuit to enjoin enforcement of the ordinance and to declare the ordinance a violation of her right of free speech.

Havlak is a professional photographer based in Saint Louis, Missouri. She describes her work as conveying an expressive message in a manner similar to the work of American portrait painter John Singer Sargent. Havlak maintains the copyright to all her photographs and licenses them to her clients for personal use only. Every year, she photographs hundreds of senior class portraits and more than a dozen weddings. Her photo shoots usually last for less than an hour and feature only a handful of people. Despite knowing about the park for more than ten years, she had never used it for photography before filing this suit. Havlak testified that she had

taken photographs in the park on two occasions. Both times, she saw at least three other photographers and their subjects in the park. During one of these shoots, Havlak instructed her client to change clothes in a wooded area and to pose outside the railing on the park bridge; it is undisputed that "a fall from the bridge could cause serious injury."

In response to this lawsuit, the Board amended its park ordinance to create a permit process for the commercial use of park facilities (Ordinance § 220.020).[2]

---

[2]The relevant portion of the ordinance follows, as codified at the time of the injunction hearing:

*Regulation of Solicitations and Commercial Activities*.

1.    Solicitation of any business or service is prohibited. No person, firm, or corporation is permitted to offer or advertise merchandise or other goods for sale or hire. Excepting Village-sponsored events and activities, the maintaining of a concession or the use of any park facility, building, trail, road, bridge, bench, table or other park property for commercial purposes is prohibited unless a permit is issued by the Board of Trustees or its designated representative(s). Such permit shall be clearly displayed by the person(s) seeking to conduct commercial activities within the park. The permitting process will help to ensure that the Village is aware of the activity taking place within the park, that the proposed date/time/location does not conflict with scheduled activities/events/operations, and that no harm is done to the landscape of the park. In its review of the permit request, the Board of Trustees or its designated representative(s) should consider:

    a.    The risk of damage and injury as set forth in Section 220.020(B) through (E);

    b.    The disruption of or conflict with the public's use and

-4-

enjoyment of the park;

 c. Whether the issuance of such permit may result in crowded or congested conditions due to the anticipated number of attendees for a planned event.

 d. The nature of the requested activity, including whether such activity involves:

  (1) The sale of products or items, which is prohibited unless it is a First-Amendment-protected activity;

  (2) The use of furniture, tents [as that term is defined in Section 220.040(D)] or large "prop" amenities, which is prohibited; or

  (3) The use of models or equipment.

 e. The time and duration requested for such commercial purposes, including:

  (1) Whether the activity will exceed one (1) hour;

  (2) Whether the number of people involved exceeds ten (10); or

  (3) Whether the time requested conflicts with a period of peak visitation to the park or other scheduled events, activities, or operations.

2. Any permit request involving less than ten (10) people, lasting for less than one (1) hour, and complying with the above, will be granted by the Village Clerk/Controller or a designee. All permit requests must be submitted at least forty-eight (48) hours before the proposed activities. Any permit request involving ten (10) or more people, lasting more than one (1) hour, or otherwise

The permit process requires the Board to consider the risk of damage to the park, any disruptive effects on typical park use, the potential congestion caused by the activity, and the nature of the activity itself. The ordinance allows for automatic approval of events lasting less than one hour, having fewer than ten people, and with 48 hours' advance notice. The permit fee is $100. As far as the record discloses, the Village has approved all permit applications.[3]

Two Board members, Lisa Eisenhauer and Chairman Ray Slama, testified at the injunction hearing regarding the legislative intent behind the permit process. In Eisenhauer's words,

> We do enjoy the photographers coming to see the park and taking pictures and using the park, but we had to balance the interest of the other park users and that's why we went to the permitting process so that the photographer receives the exclusive use of certain areas in which they wish to do their shoot so that they can perform their shoot efficiently.

conflicting with any of the above factors must be submitted at least fourteen (14) days in advance of the proposed activities so that the Board of Trustees may review the request, and the permitted authority may be limited to certain designated areas. Each permit issued by the Village shall only be effective on the date and time specified on the permit. Specific permit fees shall be set by the Board of Trustees from time to time and shall be posted on the Village's website.

Village of Twin Oaks, Mo., Rev. Ordinances ch. 220, § 220.020(P) (2016) (alteration in original).

[3]Havlak amended her complaint in response to the Village's updated permit process.

The permit fee pays for a police officer to manage the commercial event, ensure exclusive use of certain park areas, protect against interference with other park users, and ensure that park rules are followed. Chairman Slama testified: "We have found that our commercial photographers generally have issues obeying those rules." He emphasized that the Board endeavored to draw the restrictions as narrowly as possible with the express intention to "allow[] the commercial photographer[s] to come in and take their shoot." Both Board members testified to a direct correlation between the permit fee and the administration of the permit, specifically noting the cost that the Village incurs for the additional police support. Per Eisenhauer: "We ask for a permit because if we don't have a way to regulate not having five or six wedding groups down there at the same time, then we have congestion in our park which we have found to cause problems." Havlak has never applied for a commercial permit.

The district court denied Havlak's request for injunctive relief and entered a declaratory judgment in favor of the Village.

## II. *Discussion*
### A. *Facial vs. As-Applied Challenge*

Havlak challenges the Village ordinance as overly broad both facially and as applied to her. "Ordinarily, a party may not facially challenge a law on the ground that it would be unconstitutional if applied to someone else." *SOB, Inc. v. Cty. of Benton*, 317 F.3d 856, 864 (8th Cir. 2003). The First Amendment overbreadth doctrine, however, provides an avenue "whereby a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008)). "[T]he facial overbreadth doctrine 'is a departure from traditional rules of standing,' such that a party whose own expressive conduct may be unprotected is allowed to assert the First Amendment rights of others not before the court . . . ." *Republican Party of Minn. v. Klobuchar*, 381 F.3d 785, 792 (8th Cir.

2004) (citation omitted) (quoting *Alexander v. United States*, 509 U.S. 544, 555 (1993)).

For a federal court to entertain a facial challenge pursuant to the First Amendment overbreadth doctrine, "[t]here must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the [c]ourt." *Jacobsen v. Howard*, 109 F.3d 1268, 1274 (8th Cir. 1997) (quoting *Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987)). "'To be facially invalidated under this doctrine, the overbreadth of an ordinance affecting both conduct and pure speech must be both "real" and "substantial" in relation to its "plainly legitimate sweep."'" *Minn. Majority v. Mansky*, 708 F.3d 1051, 1056 (8th Cir. 2013) (quoting *Excalibur Grp., Inc. v. City of Minneapolis*, 116 F.3d 1216, 1224 (8th Cir. 1997)). "'Facial challenges are disfavored' because they 'often rest on speculation . . . [and] raise the risk of premature interpretation of statutes on the basis of factually barebones records.'" *Phelps–Roper v. City of Manchester*, 697 F.3d 678, 685 (8th Cir. 2012) (alteration in original) (internal quotation marks omitted) (quoting *Wash. State Grange*, 552 U.S. at 450).

Havlak bears the burden to demonstrate that she has standing to bring a facial overbreadth claim. *See Klobuchar*, 381 F.3d at 791. For such challenges, "the party before the court must identify a significant difference between his claim that the statute is [facially] invalid on overbreadth grounds, and his claim that it is unconstitutional as applied to his particular activity." *Van Bergen v. Minn.*, 59 F.3d 1541, 1549 (8th Cir. 1995). "We generally do not apply the 'strong medicine' of overbreadth analysis where the parties fail to describe the instances of arguable overbreadth of the contested law." *Wash. State Grange*, 552 U.S. at 449 n.6 (internal quotation marks omitted) (quoting *N.Y. State Club Ass'n v. City of N.Y.*, 487 U.S. 1, 14 (1988)). It is inappropriate to entertain a facial overbreadth challenge when the plaintiff fails to adduce any evidence that third parties will be affected in any manner

-8-

differently from herself. *See Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 802 (1984); *see also Ashcroft v. Am. Civil Liberties Union*, 535 U.S. 564, 584–85 (2002) (dismissing a facial overbreadth challenge for failure to meet burden relating to other parties); *Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1157 (8th Cir. 2014) ("[T]he fact one can conceive of an impermissible application of a statute is not sufficient to render it susceptible to an overbreadth challenge."). Havlak presents no allegedly unconstitutional scenarios affected by the Village ordinance beyond her own commercial photography, so we will limit our analysis to the ordinance's application to Havlak.

B. *Time, Place, and Manner Regulation*

We review the district court's denial of injunctive relief for an abuse of discretion, and we will reverse only if the district court made "clearly erroneous factual findings or erroneous legal conclusions." *Traditionalist Am. Knights of the Ku Klux Klan v. City of Desloge*, 775 F.3d 969, 974 (8th Cir. 2014) (quoting *S.J.W. ex rel. Wilson v. Lee's Summit R–7 Sch. Dist.*, 696 F.3d 771, 776 (8th Cir. 2012)). In First Amendment cases, we review the constitutional claims de novo, *see Johnson v. Minneapolis Park & Recreation Bd.*, 729 F.3d 1094, 1098 (8th Cir. 2013), and we independently examine the record to ensure that there is no "forbidden intrusion on the field of free expression," *Families Achieving Indep. & Respect v. Neb. Dep't of Soc. Servs.*, 111 F.3d 1408, 1411 (8th Cir. 1997) (en banc) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 285 (1964)).

As incorporated through the Fourteenth Amendment, *see Survivors Network of Those Abused by Priests, Inc. v. Joyce*, 779 F.3d 785, 789 (8th Cir. 2015), the First Amendment's prohibition against "abridging the freedom of speech," U.S. Const. amend. I, applies to ordinances enacted by the Village. Nevertheless, the Village may "regulate competing uses" of a traditional public forum, like a park, by "impos[ing] a permit requirement." *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992); *see also Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017) ("A

basic rule . . . is that a street or a park is a quintessential forum for the exercise of First Amendment rights."). Although we apply a "heavy presumption" against the validity of ordinances that create prior restraints on speech, we will uphold such ordinances if they meet the constitutional standards for time, place, and manner regulations. *See Forsyth Cty.*, 505 U.S. at 130 (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963)).

"[A]ny permit scheme controlling the time, place, and manner of speech must not be based on the content of the message, must be narrowly tailored to serve a significant governmental interest, and must leave open ample alternatives for communication." *Id.* Additionally, "[s]uch regulations . . . must not 'delegate overly broad licensing discretion to a government official,' and contain narrow, objective, and definite standards to guide licensing authorities." *Douglas v. Brownell*, 88 F.3d 1511, 1521 (8th Cir. 1996) (quoting *Forsyth Cty.*, 505 U.S. at 130). We will analyze the ordinance by these elements.[4]

### 1. *Content Neutrality*

"Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015). "[C]ourts will

---

[4]Like the district court, we assume without deciding that Havlak's photography constitutes expressive conduct entitled to First Amendment protections. *See Josephine Havlak Photographer, Inc. v. Vill. of Twin Oaks*, 195 F. Supp. 3d 1065, 1075 (E.D. Mo. 2016). Because Havlak's constitutional claim fails under the "most exacting test" of First Amendment expression, we need not decide whether her photography qualifies as expressive conduct or analyze the ordinance under the rubric of commercial speech. *See Kaahumanu v. Hawaii*, 682 F.3d 789, 800 (9th Cir. 2012); *see also Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011) ("[T]he outcome is the same whether a special commercial speech inquiry or a stricter form of judicial scrutiny is applied.").

apply a strict scrutiny analysis when the regulation discriminates on the basis of content, and a more lenient analysis to content-neutral regulations." *Bery v. City of N.Y.*, 97 F.3d 689, 696 (2d Cir. 1996). "The principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Id.*

Havlak argues that two recent Supreme Court cases—*Reed*, 135 S. Ct. 2218, and *Sorrell*, 564 U.S. 552—"have moved the goalposts for legislators seeking to regulate speech based on the identity of the speaker and the type of message." She argues that the Village ordinance was intentionally created to burden the speech rights of commercial photographers. *See Reed*, 135 S. Ct. at 2230 ("Because '[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content,' we have insisted that 'laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference.'" (first quoting *Citizens United v. FEC*, 558 U.S. 310, 340 (2010); then quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 658 (1994))). This legislative intent, she argues, requires us to apply strict scrutiny instead of the intermediate scrutiny traditionally applied to content-neutral "time, place, and manner" restrictions of a traditional public forum.

> Because strict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based, a court must evaluate each question before it concludes that the law is content neutral and thus subject to a lower level of scrutiny.

*Id.* at 2228. In this case, the Village ordinance is facially content neutral and no evidence shows a content-based purpose or justification.

Ordinance § 220.020 is facially neutral, unlike the restrictions in both *Reed* and *Sorrell* which directly burdened speech content. *See, e.g.*, *Reed*, 135 S. Ct. at 2227 ("The Town's Sign Code is content based on its face."); *Sorrell*, 564 U.S. at 564 ("The law on its face burdens disfavored speech by disfavored speakers."). The Village's ordinance does not reference any specific commercial enterprise or any specific message. It applies equally, for example, to commercial photographers and to hot dog vendors. The "commonsense meaning of the phrase 'content based' requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Reed*, 135 S. Ct. at 2227 (quoting *Sorrell*, 564 U.S. at 565–66). Lacking any reference to any specific message or messenger, the ordinance facially avoids Havlak's content-based characterization.

The record also shows the lack of a content-based purpose behind Ordinance § 220.020. "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of *disagreement* with the message it conveys." *Ward*, 491 U.S. at 791 (emphasis added). Since the park's dedication in 1994, the Village has banned all commercial activity in the park. The Village updated its ordinance in 2015 to allow permitting for commercial activity. In large measure, the Board enacted the permit process not to further restrict speech but to allow a lawful avenue for expression. The Board members testified of "enjoying" the photographers and wanting to give them "the benefit" of park resources. The evidence shows that the regulatory intent was not to burden a message but to allocate resources and address legitimate concerns for safety. *See, e.g.*, *United States v. Nenninger*, 351 F.3d 340, 345–46 (8th Cir. 2003).

Havlak argues that because this ordinance burdens commercial photographers and not non-commercial ones, the Village burdens her message of "family, peace, tranquility and love." There is no evidence that the Village shows antipathy for these values, and the ordinance does not restrict either commercial or non-commercial

-12-

photographers from expressing these ideals. "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward*, 491 U.S. at 791; *cf. Kaahumanu*, 682 F.3d at 810–11 (denying an equal-protection claim against an ordinance that burdened commercial weddings but not non-commercial ones). "Characterizing a distinction as speaker based is only the beginning—not the end—of the inquiry." *Reed*, 135 S. Ct. at 2230–31. When a facially-neutral restriction is not based on "disagreement with the message" and is "justified without reference to the content of the regulated speech," we will apply intermediate scrutiny. *Cf. id.* at 2227 (internal quotation marks omitted) (quoting *Ward*, 491 U.S. at 791).

We find the Village ordinance content neutral because it does not facially discriminate on the basis of content and the record does not indicate any governmental purpose to burden any particular message. *See Recycle for Change v. City of Oakland*, 856 F.3d 666, 674 (9th Cir. 2017) ("Because the Ordinance does not, by its terms, discriminate on the basis of content, and there is no evidence that Oakland enacted the Ordinance with an intent to burden RFC's message of charitable solicitation or out of any disagreement with that message, the Ordinance is content neutral."); *Patriotic Veterans, Inc. v. Zoeller*, 845 F.3d 303, 306 (7th Cir. 2017), *cert. denied sub nom. Patriotic Veterans, Inc. v. Hill*, No. 16-1198, 2017 WL 2722437 (U.S. June 26, 2017) ("Because Indiana does not discriminate by content—the statute determines who may be called, not what message may be conveyed—these decisions have not been called into question by *Reed*.").

## 2. *Narrow Tailoring*

Havlak concedes that the ordinance was adopted to serve the significant government interests of reducing congestion and maintaining park safety. *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 650 (1981) ("As a general matter, it is clear that a State's interest in protecting the 'safety and convenience' of persons using a public forum is a valid governmental objective."). Under the test for

time, place, and manner restrictions, the question remains whether the ordinance is narrowly tailored to meet those interests. "[T]he requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Ward*, 491 U.S. at 799 (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)). "[T]he government's choice among the means to accomplish its end is entitled to deference." *Ass'n of Cmty. Orgs. for Reform Now v. St. Louis Cty.*, 930 F.2d 591, 595 (8th Cir. 1991). Acceptable legislative purposes for permits include "to coordinate multiple uses of limited space, to assure preservation of the park facilities, to prevent uses that are dangerous, unlawful, or impermissible under the Park District's rules, and to assure financial accountability for damage caused by the event." *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 322 (2002).

First, Havlak contends that the ordinance's application to groups of all sizes renders it overly broad. Because groups smaller than ten do not pose the same hazards to the use and safety of the park that larger groups would, she argues that requiring a permit for these smaller groups shows a lack of narrow tailoring. She relies on *Douglas*, 88 F.3d at 1524, in which we suggested that a permit requirement for parades containing ten or fewer people might not be narrowly tailored. *See also Am.–Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 608 (6th Cir. 2005) ("The Ordinance is overly broad because under the Ordinance as written, any procession of people with a common purpose or goal, whether it be a small group of protestors or a group of senior citizens walking together to religious services, are conceivably required to obtain a permit . . . ."). Unlike *Douglas*, in which the permit process quelled potential spontaneous speech by an unlimited number of different small groups, Ordinance § 202.020 applies specifically to commercial activity and is distinguishable because it does not prevent small-scale expressive activity unrelated to commercial enterprises. The Ninth Circuit rejected a similar argument in *Kaahumanu*, in which plaintiffs argued that a permit requirement for commercial weddings "as small as three individuals" on public beaches was not narrowly tailored.

-14-

682 F.3d at 804. Even though Hawaii contains more than 200 public beaches for this activity, the court upheld the permit requirement because it was reasonably "designed to minimize conflicting uses of limited beach area and to conserve the physical resource of the beaches." *Id.* at 803. The same reasoning applies here.

Havlak also points to *Thomas*, but she argues that the Supreme Court allowed the permit requirement there because the pertinent regulation applied only to groups of 50 or more. 534 U.S. at 322. In *Thomas*, however, the Court did not suggest that requiring a permit for fewer than 50 people would be unconstitutional, but it rather suggested that permit ordinances should be fashioned for the efficient use of park resources. *See id.* ("[T]o allow unregulated access to all comers could easily reduce rather than enlarge the park's utility as a forum for speech." (quoting *Thomas v. Chi. Park Dist.*, 227 F.3d 921, 924 (7th Cir. 2000))). Havlak ignores the problem of the aggregation of small-group commercial activity within the Village park. The record reveals an occasion when as many as eight small groups of commercial photographers and their clients simultaneously attempted to use the park's amenities. Havlak testified that on both occasions in which she attempted to photograph subjects in the park there were no less than three other groups shooting photography, too. Given the high demand, the history of congestion, and the limited facilities of the park, the ordinance's lack of a permit exception for groups smaller than ten people does not create a constitutional infirmity.

Second, Havlak argues that the ordinance is overly broad because the permit is not restricted to certain congestion points known to attract commercial photographers, but rather covers the entire 11-acre park. This argument ignores the fact that the ordinance is designed to regulate all commercial activity—from commercial yoga classes to basketball tournaments—not all of which would attempt to use the same small areas preferred by commercial photographers. The permit allows the Village to globally promote maximum use of park resources and protect

against damage to all park facilities, not just those most used by photographers. *See Kaahumanu*, 682 F.3d at 803.

Third, Havlak argues that the two-day application period (for events of fewer than ten people) and the 14-day period (for larger groups) are not narrowly tailored because they serve to chill artistic expression. *See, e.g.*, *Church of the Am. Knights of the Ku Klux Klan v. City of Gary*, 334 F.3d 676, 682–83 (7th Cir. 2003) (rejecting 45-day advance permit notifications); *Douglas*, 88 F.3d at 1524 ("The five-day notice requirement restricts a substantial amount of speech that does not interfere with the city's asserted goals of protecting pedestrian and vehicle traffic, and minimizing inconvenience to the public."). The cases presented by Havlak, however, deal exclusively with ordinances that inhibit spontaneous speech. Much like weddings, *see Kaahumanu*, 682 F.3d at 805, commercial photography shoots are rarely spontaneous. Havlak testified that she discusses potential locations with clients before shooting. For wedding photography, these discussions happen up to a year in advance. Havlak contends that unpredictable light and weather conditions require spontaneity. Much like commercial weddings, however, commercial photography only requires spontaneity if unfavorable weather conditions arise. Planning for the event itself is rarely spontaneous. As applied to her, these time periods sufficiently enable Havlak to reasonably obtain permits for her commercial shoots.

Additionally, Board members testified that the two-day period was designed to give their clerk (one of two full-time Village employees) the time required to process permit applications. The 14-day period enables the Board itself to review permits for larger commercial events, because the Board "meets the first and third Wednesday[s] of each month." These time periods fall squarely in line with the processing times of similar constitutional permit ordinances. *See, e.g.*, *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1045 (9th Cir. 2006) ("The two-day period . . . accords with Santa Monica's significant governmental interests by . . . providing a coordinated process for managing community events in heavily

-16-

burdened and limited public space . . . ."); *Thomas*, 534 U.S. at 324 (approving a permit application process for large groups of 28 days). We conclude that the permit processing times included in the ordinance are narrowly tailored to the significant interests of the Village's efficient administration of its governmental duties.

Fourth, Havlak contends that the ordinance is not narrowly tailored because the administrative fee is too high. It is well established, however, that "fees that cover only the administrative costs of the license are permissible." *Jacobsen v. Crivaro*, 851 F.2d 1067, 1071 (8th Cir. 1988). Havlak argues that the $100 fee is excessive considering the cost that the Village incurs to administer the permit process. Yet, Board members testified that there was a "direct correlation" between the fee and the cost that the Village incurs, and the record supports this assertion. Board members testified that any commercial activity would require a police officer for at least two hours. By contract, the Village is charged $38.70 per hour for officer patrols, and this does not include the additional fees that the Village must pay for patrol-vehicle maintenance and mileage. The record demonstrates an overall cost of employing an officer for two hours amounts to more than $93. Moreover, this number does not include the administrative costs for the Village clerk to handle the permit process. *See Kaahumanu*, 682 F.3d at 794, 809 (approving a $20 application fee, plus a $0.10 fee per square foot, and an insurance requirement of approximately $250 per year). We hold that the fee amount is narrowly tailored to the actual costs that the Village incurs.

The Village may not broadly prohibit free expression when satisfactory alternatives exist. *See Ass'n of Cmty. Orgs. for Reform Now v. City of Frontenac*, 714 F.2d 813, 819 (8th Cir. 1983). But, the Village ordinance "need not be the least restrictive or least intrusive means" of regulating public space. *Ward*, 491 U.S. at 798. "So long as the means chosen are not substantially broader than necessary to achieve the government's interest . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some

less-speech-restrictive alternative." *Id.* at 800. As applied to Havlak, we find the ordinance meets the narrowly-tailored requirement.[5]

### 3. *Ample Alternatives*

Havlak also argues that the "unique" nature of the park makes it a one-of-a-kind place, which no alternative could replace—and thus, the Village cannot demonstrate that sufficient alternatives exist. *Cf. Galvin v. Hay*, 374 F.3d 739, 756 (9th Cir. 2004) ("[T]he question must be whether the regulation prevents the speakers from expressing their views, where that expression depends in whole or part on the chosen location."). The record demonstrates, however, that the natural attributes of the park exist in multiple locations across the Saint Louis area. In fact, although Havlak does hundreds of photo shoots per year, she had not used the Village park until learning about the ordinance; and since that time, she testified to using it only twice. She frequently uses other city locations to voice the same messages she seeks to express at the Village park. "[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron*, 452 U.S. at 647; *see also Mastrovincenzo v. City of N.Y.*, 435 F.3d 78, 101 (2d Cir. 2006) ("The requirement that 'ample alternative channels' exist does not imply that alternative channels must be perfect substitutes for those channels denied to plaintiffs by the regulation at hand; indeed, were we to interpret the requirement in this way, no alternative channels could ever be deemed 'ample.'"). The First Amendment does not require that artists get unrestricted access to "an ideal venue," but rather that "alternative avenues" of communicating their message are

---

[5]Havlak also argues that the ordinance is overly broad because it targets only commercial photographers instead of unpaid photographers, but this is simply a reiteration of her claim that the ordinance is content based, and it fails for the same reasons as her content-discrimination argument.

available. *Mastrovincenzo*, 435 F.3d at 102. The record demonstrates that Havlak has ample alternative channels for communicating her message.[6]

### 4. *Licensing Discretion*

"[A] city may enact licensing procedures for conduct commonly associated with expression, so long as the city 'establish[es] neutral criteria to [e]nsure that the licensing decision is not based on the content or viewpoint of the speech being considered.'" *Crivaro*, 851 F.2d at 1070 (second alteration in original) (quoting *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 760 (1988)). "A government regulation that allows arbitrary application is 'inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view.'" *Forsyth Cty.*, 505 U.S. at 130 (quoting *Heffron*, 452 U.S. at 649). "'[A] law subjecting the exercise of First Amendment freedoms to the prior restraint of a license' must contain 'narrow, objective, and definite standards to guide the licensing authority.'" *Id.* at 131 (quoting *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51 (1969)).

Havlak argues that the ordinance is "impermissibly vague" and provides unbridled discretion to the Village to approve or deny permits. The ordinance, however, provides "articulated standards" and "objective factors" that the clerk and the Board are to consider when granting permits. *See id.* at 133. The ordinance requires the Village licensing officials to look at the nature of the activity, potential conflicts with other scheduled events, the number of participants, and other factors relevant to resource allocation. *See Thomas*, 534 U.S. at 323 (approving a "time,

---

[6]At the heart of Havlak's argument that alternative options do not exist is the fear that this ordinance establishes incentives for "every small town to create identical permit schemes." We do not address this situation because it is not before us. *Cf. Thomas*, 534 U.S. at 325 ("[T]his abuse must be dealt with if and when a pattern of unlawful favoritism appears, rather than by insisting upon a degree of rigidity that is found in few legal arrangements.").

place, and manner regulation contain[ing] adequate standards to guide the official's decision"). None of the factors listed in the ordinance deal with the content of speech, and Board members testified that they have never denied a permit application.

The plain language of the ordinance guarantees permit approval for events consisting of less than ten people, for less than an hour, and submitted 48 hours in advance. For larger events, the Board may look only at legitimate factors relating to park use and safety when analyzing a permit application. "While these standards are undoubtedly flexible, and the officials implementing them will exercise considerable discretion, perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward*, 491 U.S. at 794; *see also Thomas*, 534 U.S. at 324 (noting "the Park District may deny a permit only for one or more of the reasons set forth in the ordinance"). Thus, we conclude the ordinance does not grant unbridled discretion to the Village, and its licensing factors survive constitutional scrutiny.

Because the Village ordinance is content neutral, has been narrowly tailored to serve the Village's significant governmental interests, leaves ample alternatives for Havlak to communicate her message, and does not provide the Village with unbridled discretion, we find the permit process survives Havlak's challenge. *See Forsyth Cty.*, 505 U.S. at 130.

III. *Conclusion*

We conclude that the Village ordinance meets constitutional scrutiny as-applied to Havlak. We, therefore, affirm the judgment of the district court.

_____