# United States Court of Appeals
## For the Eighth Circuit
_____

No. 22-3459
_____

Cory Sessler

*Plaintiff - Appellant*

v.

City of Davenport, Iowa; Greg Behning, in his individual capacity acting as a
police officer for the City of Davenport, Iowa; Jason Smith, in his individual
capacity acting as a police officer for the City of Davenport, Iowa; J.A. Alcala, in
his individual capacity acting as a police officer for the City of Davenport, Iowa

*Defendants - Appellees*
_____

Appeal from United States District Court
for the Southern District of Iowa - Eastern
_____

Submitted: September 21, 2023
Filed: May 23, 2024
_____

Before SMITH, Chief Judge,[1] MELLOY and ERICKSON, Circuit Judges.
_____

MELLOY, Circuit Judge.

---

[1]Judge Smith completed his term as chief judge of the circuit on March 10, 2024. *See* 28 U.S.C. § 45(a)(3)(A).

Plaintiff Cory Sessler and several associates loudly preached a religious message to passersby and shoppers inside a fenced-off, vendor-occupied area of downtown Davenport, Iowa (the City), during a secular, commercial festival. Vendors within the fenced-off area had entered into agreements with festival organizers to rent spaces or stalls to sell goods and food or to conduct performances. Mr. Sessler was not a paying vendor and had entered into agreements with neither festival organizers nor the City. The fenced-off area, consisting of City streets and sidewalks in the City center, undisputedly served as a "traditional public forum" under normal circumstances when fences were not erected. During the festival, however, vehicle traffic was excluded and pedestrian access was controlled but did not require the purchase of tickets.

After police officers and Mr. Sessler's group cooperatively attempted to find a mutually acceptable location for Mr. Sessler's group within the festival grounds, the group preached for approximately thirty minutes within the grounds and near an entrance. Then, in response to nearby vendors' complaints, officers ordered the group to relocate to a spot outside the fences and across a street. The group complied and continued to preach to, and interact with, passersby for over two hours.

Mr. Sessler later sued three officers invoking 42 U.S.C. § 1983 and alleging a violation of his free exercise and free speech rights under the First Amendment of the U.S. Constitution. He also sued the City of Davenport pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), alleging officers acted pursuant to an unconstitutional policy. Mr. Sessler moved for a preliminary injunction, which the district court denied. Our court affirmed. *See Sessler v. City of Davenport*, 990 F.3d 1150 (8th Cir. 2021).

After discovery, the district court[2] granted summary judgment to the defendants concluding the officers did not violate Mr. Sessler's rights and, in the

---

[2]The Honorable Rebecca Goodgame-Ebinger, United States District Judge for the Southern District of Iowa.

alternative, qualified immunity applied. The district court also granted summary judgment to the City on the official-policy claims.

This case presents many challenging and close questions. As such, we agree that qualified immunity applies to the claims against the officers. It was not clear at the time of the events in this case whether the fenced-off City streets and sidewalks remained a "traditional public forum" or whether they served as a less-protected "limited public forum." Further, no reasonable trier of fact could conclude from the summary judgment record that the officers' actions were anything but content neutral or that such actions were unreasonable or otherwise restricted or diminished Mr. Sessler's access to his intended audience. In short, the officers in the present case acted within a gray area and transgressed no bright lines clearly established by existing caselaw. Finally, nothing about the City's general policy of permitting a private festival to take place impinged upon Mr. Sessler's rights. Accordingly, we affirm the judgment of the district court.

I.

In this appeal from a grant of summary judgment, we present the facts in the light most favorable to Mr. Sessler, the non-moving party. The facts are drawn largely from uncontested deposition testimony and from several body-cam videos of the events at issue. Street Fest was a commercial event held by a division of the Davenport Chamber of Commerce in conjunction with a popular foot race, the "Bix 7." Typically, tens of thousands of people participated in the race, and similar numbers attended Street Fest every year. Street Fest no longer takes place, but the annual Bix 7 race continues, and Mr. Sessler asserts other commercial events and festivals take place in and around Davenport at the same time.

In summer 2018, Davenport had in place a City Special Event Policy allowing events like Street Fest to take place on public land subject to City approval and a permitting process. Street Fest organizers applied for and obtained a permit subject to several requirements imposed by the City. Most importantly for the present case,

the City allowed Street Fest organizers to limit access to several blocks of streets in the core downtown area subject to a requirement that organizers erect fencing and hire off-duty City police officers as security.

Organizers installed six-foot high chain link fences around the festival area, left open several points for unticketed pedestrian entry and exit, and hired officers as required. Vendors entered into contracts with the organizers to pay for spaces within the fenced-off area or to conduct business as "roaming vendors" within the area. The vendor contracts required the vendors to agree to limitations on their noise levels and their interference with other vendors.

During the festival, Mr. Sessler, three other adults, and two children entered the fenced-off area, positioned themselves in a first location, and began loudly sharing their religious message using a microphone, a loudspeaker, and signs on extendible poles. The children distributed pamphlets. The group neither applied for nor entered into a vendor contract with the Street Fest organizers.

Defendant Officer Smith and a festival organizer told the group they were in a vendor-rented spot. Defendant Officers Alcala and Behning joined Officer Smith and asked the group to move to a different location. Interactions between the officers and Mr. Sessler were calm and seemingly respectful. The officers and Mr. Sessler both referenced trying to find a compromise. Someone in Mr. Sessler's group suggested a different spot. Officer Smith rejected the suggestion because the spot was too close to where a performer was about to begin and Officer Smith did not think the group should be "on the microphone preaching over the top" of a vendor/performer. Officer Smith also rejected a second suggestion from Mr. Sessler's group, characterizing the spot as a traffic "choke point." Officer Smith offered as a third suggestion a courtyard within the fenced-off area adjacent to one of the streets, but stated, "If you're screaming over the top of vendors or impeding their point of sales at all, then we're going to have to fix that again."

Officer Alcala went with the group to the suggested courtyard, but the group and Officer Alcala could not agree upon a particular spot. The group suggested a location Officer Alcala rejected because it was rented to a vendor. Officer Alcala suggested a location the group rejected because it was blocked from clear public view by vendor tents. Eventually, Officer Alcala and the group agreed the group could preach from a location within the fenced-off area near one of the entrances.

At the entrance location, the group preached for approximately thirty minutes, during which time several vendors complained to festival organizers who, along with the vendors, complained to Officers Smith and Behning. Mr. Sessler later estimated that his own volume was such that pedestrians would have had to move at least thirty feet away from him to avoid his voice. The complaining vendors and organizers asserted that the group was blocking customers and driving customers away. One vendor stated, "He's telling my customers they're going to hell."

In response to the complaints, Officers Smith and Behning told the group to leave the fenced-off area and directed them to a location across the street from the entrance. Officer Smith told the group they would be arrested if they failed to move. The group moved to the indicated location and resumed preaching for over two hours to large crowds of passersby, many of whom were entering or exiting the fenced-off area. Many of these people engaged with Mr. Sessler's group. No one from Mr. Sessler's group had any additional interactions with the police after leaving the fenced-off area.

Several weeks later, Mr. Sessler contacted the City. An assistant City attorney told him she had reviewed the incident and found nothing unlawful. She also stated the Street Fest organizers controlled access to the area during the festival.

II.

We review the district court's grant of summary judgment de novo.[3] *Glover v. Bostrom*, 31 F.4th 601, 603 (8th Cir. 2022) ("Summary judgment is appropriate when 'there is no genuine dispute as to any material fact.'" (quoting Fed. R. Civ. P. 56(a))). We draw reasonable inferences in Mr. Sessler's favor, but "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

The government's ability to restrict protected speech such as religious messaging depends on (1) the nature of the forum in which the speech occurs, and (2) whether the restriction is content-based or content-neutral. *See Powell v. Noble*, 798 F.3d 690, 699–700 (8th Cir. 2015). The question of content neutrality asks whether the restriction is "based on the content of the speech" or some other factor. *See Forsyth County. v. Nationalist Movement*, 505 U.S. 123, 134 (1992).

A traditional public forum is a public space where citizens have traditionally spoken freely and exchanged ideas. In a traditional public forum, such as a generally open street, park, or sidewalk, the government faces the most restrictions on its ability to limit speech. Content-based restrictions in a traditional public forum are subject to strict scrutiny: they must be narrowly tailored to serve a compelling

---

[3]Mr. Sessler asserted free-exercise and free-speech claims in his complaint but briefed only the free-speech claims below and on appeal. Accordingly, we address his free-speech claims and treat his free-exercise claims as waived. Further, the entire course of interaction between Mr. Sessler's group and the officers is relevant to provide context, define the rights at issue, and establish what a reasonable jury could conclude. But Mr. Sessler appears to limit his allegation of a constitutional violation to the final move: his exclusion from the festival grounds. Because Officer Alcala's interactions with Mr. Sessler's group ended before the allegedly unconstitutional exclusion from the festival grounds, the claims against Officer Alcala fail for the reasons stated herein as well as for the independent reason that he did not participate in the allegedly unconstitutional act.

government interest. *Ball v. City of Lincoln*, 870 F.3d 722, 730 (8th Cir. 2017). Content-neutral restrictions in such a forum may address matters like the time, place, or manner of speaking but are subject to intermediate scrutiny: they must be "narrowly tailored to serve a significant government interest, and leave[] open ample channels of communication." *Id.* (citation omitted).

A public area that has not traditionally been open, but which the government has designated for open expression and debate, is a designated public forum. A designated public forum is treated the same as a traditional public forum when assessing the government's ability to restrict speech. *Id.*

In contrast, a limited public forum, sometimes referred to as a nonpublic forum, is an area that is neither traditionally open for public discourse nor specifically designated for such use. *Id.* (nonpublic forum); *see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 47 (1983) (limited public forum). In a limited public forum, the government is less constrained in its ability to restrict protected speech because, generally speaking, the government must be allowed to put its property to various intended uses, not all of which are consistent with largely unfettered citizen speech or frequent disruption. *See Ball*, 870 F.3d at 729–30 (stating that the "government, no less than a private owner of property, has the power to preserve the property under its control for the use to which it is lawfully dedicated" (quoting *United States v. Grace*, 461 U.S. 171, 178 (1983) (citation omitted))); *see also, e.g.*, *Fams. Achieving Indep. & Respect v. Neb. Dep't of Soc. Servs.*, 111 F.3d 1408, 1419 (8th Cir. 1997) (stating that the lobby of a social services office was not a public forum because its primary purpose was to provide services to welfare recipients rather than foster the exchange of ideas). In a limited public forum, the government may impose content-neutral restrictions so long as the restrictions are reasonable. *Ball*, 870 F.3d at 729–30.

In assessing the nature of various fora, our court has relied on several non-exhaustive considerations, including: (1) "the physical characteristics of a venue" such as markings, fences, or other items setting off an area as a "special enclave";

(2) the typical use of the specific venue; (3) the venue's function and objective purpose; and (4) the government's intent for the venue. *Ball*, 870 F.3d at 731–36 (discussing and applying factors). We also look at "any special characteristics regarding the environment in which" the venue exists. *Powell*, 798 F.3d at 700 (quoting *Bowman v. White*, 444 F.3d 967, 978 (8th Cir. 2006)). In assessing these factors, no one consideration controls the analysis, particular characteristics are not necessarily talismanic, and important purposes and special characteristics may be temporary. *See, e.g.*, *Powell*, 798 F.3d at 699–700 (finding a sidewalk to be a limited public forum while a fair was taking place); *see also United States v. Kokinda*, 497 U.S. 720, 727 (1990) ("The mere physical characteristics of the property cannot dictate forum analysis.").

Turning to the facts at hand, we agree with Defendants that the restrictions at issue were content neutral and reasonable. The summary judgment record as a whole, including the repeated interactions with officers, the clear emphasis on volume and disruption, the cooperative efforts to find an acceptable location, the opportunity to preach within the Street Fest grounds after repeated warnings as to volume prior to removal, and the ample opportunity for continued preaching to large crowds of the same intended audience outside the fences make clear that no reasonable jury could find the officers based their actions on the content of Mr. Sessler's message.

Mr. Sessler correctly notes that (1) a complaining vendor referenced him telling her customers they were going to hell, and (2) Officer Smith stated that vendors or customers had "taken offense." Mr. Sessler, therefore, likens his group's ejection from the fenced-off area as police action honoring a content-based "heckler's veto." *See, e.g.*, *Bible Believers v. Wayne Cnty.,* 805 F.3d 228, 234 (6th Cir. 2015) ("The scenario presented by this case, known as the 'heckler's veto,' occurs when police silence a speaker to appease the crowd and stave off a potentially violent altercation."). But the present case simply is not a case about officers restricting speech to prevent a violent backlash from listeners. Rather, this is a case about disruption by a speaker who had received repeated warnings about his volume.

Although isolated quotes lend some support to Mr. Sessler's position, we conclude that such statements, taken in context, amount to the proverbial "mere scintilla" of evidence insufficient to preclude summary judgment. *See Anderson v. Rugged Races, LLC*, 42 F.4th 955, 958 (8th Cir. 2022) ("A mere scintilla of evidence is insufficient to defeat summary judgment and if a nonmoving party who has the burden of persuasion at trial does not present sufficient evidence as to any element of the cause of action, then summary judgment is appropriate." (quoting *Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 820 (8th Cir. 2010))). Stray comments in this extensive record simply do not create a triable question of fact as to content neutrality.

Turning to the nature of the forum, Mr. Sessler argues the fenced-off streets and sidewalks within the Street Fest grounds stand as classic examples of a traditional public forum. *See, e.g.*, *Grace*, 461 U.S. at 179 (noting that sidewalks typically are deemed public fora with little additional analysis). He argues further that, although a government may designate a non-public forum to serve as a public forum, a government cannot likewise strip an otherwise traditional public forum of its status by permitting a private party to erect fences and put it to a temporary and different use. Accordingly, Mr. Sessler urges us to accord little weight to the presence of fences and vendor booths or the similarities between Street Fest and an enclosed fair.

Defendants, in contrast, urge us to hold that the Street Fest grounds within the six-foot fences served as a limited public forum during Street Fest. According to Defendants, the area was more like a limited-purpose fairgrounds than a street during the festival as evidenced by actual use, governmental intent, and conspicuous physical barriers. In support of their argument, Defendants cite *Powell*, in which we held sidewalks on the grounds of the Iowa State Fair, but outside of the area where tickets were required for entry, served as a limited public forum while the fair was underway. 798 F.3d at 700 ("The property in question—at least during the fair— . . . ."); *see also Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 655 (1981) ("The Minnesota State Fair is a limited public forum in that it exists to

-9-

provide a means for a great number of exhibitors temporarily to present their products or views, be they commercial, religious, or political, to a large number of people in an efficient fashion."). Defendants also note a lack of clear authority categorically barring governments from temporarily reserving or changing the purpose for which property is used.

In light of the foregoing difficult and potentially meritorious arguments, we conclude it is unnecessary to resolve the parties' dispute as to whether the streets retained their character as a traditional public forum during the festival. Reasonable jurists may debate the similarities and differences between the facts presented in *Powell*, similar cases, and the present case. But qualified immunity for the police officers as against the present claims for damages does not turn on the debates of reasonable jurists. In this gray area, qualified immunity applies to shield the officers from suit.

It suffices to hold that (1) the officers' actions satisfied the reasonableness standard for content-neutral restrictions in a limited public forum, and (2) no firmly established authority demonstrates the fenced-off area was a traditional public forum during Street Fest. *See Pearson v. Callahan*, 555 U.S. 223, 243–44 (2009) (qualified immunity protects officers from suit unless officers violated a clearly established constitutional right, and courts may address the "clearly established" prong as a first step in analysis). In reaching this conclusion, we emphasize that we do not define clearly established rights in the abstract or at a "high level of generality." *Kisela v. Hughe*s, 138 S. Ct. 1148, 1152 (2018); *see also Bus. Leaders in Christ v. Univ. of Iowa*, 991 F.3d 969, 980 (8th Cir. 2021) ("The clearly established inquiry focuses 'on whether the offic[ial] had fair notice that her conduct was unlawful' . . . The Supreme 'Court's caselaw does not require a case directly on point for a right to be clearly established [but] existing precedent must have placed the statutory or constitutional question beyond debate.'" (quoting *Kisela*, 138 S. Ct. at 1152)). As such, the simple fact that the forum at issue involved a city street does not resolve the forum question. *See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 801 (1985) ("[F]orum analysis is not completed merely by identifying the

government property at issue"). The presence of compelling countervailing details as to the nature of the forum precludes the imposition of liability on the officers.

Regarding the City, summary judgment was proper because there is no evidence of an unconstitutional policy. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) (municipal liability requires "action pursuant to official municipal policy of some nature [that] caused a constitutional tort"). Mr. Sessler points to the City's Special Events Policy and the assistant City attorney's after-the-fact description of the officers' actions as legal. On its face, however, the City's general Special Events Policy is silent not only as to speech, but as to almost all features Mr. Sessler asserts as material to the present case. Further, nothing about the actual restrictions the officers imposed on Mr. Sessler stemmed from an official City policy. And, to the extent Mr. Sessler asserts that after-the-fact comments by an assistant City attorney reflect official policy, the assistant City attorney was not a final policymaker nor are we inclined to treat such comments (comments akin to the statement of a litigation position) as an overarching or preexisting City policy.

Finally, to the extent Mr. Sessler otherwise asserts an entitlement to injunctive or other relief, we conclude he lacks standing. Street Fest no longer occurs, Mr. Sessler has articulated no definite nor specific plans for future demonstrations, and there has been no showing of a likelihood of similar facts arising to make similar events repeat themselves. The likelihood of any future potentially unconstitutional application of the City's general Special Events Policy under sufficiently similar circumstances is too speculative a possibility to permit adjudication. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02 (1983) ("The plaintiff must show that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical." (citations omitted)).

We affirm the judgment of the district court.

SMITH, Circuit Judge, concurring.

I concur in the well-reasoned opinion of the court. I write separately to emphasize that, even assuming the officers violated Sessler's constitutional rights, those rights were not clearly established under existing precedent.

> For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. A plaintiff must identify either controlling authority or a robust consensus of cases of persuasive authority that placed the statutory or constitutional question beyond debate at the time of the alleged violation. In other words, the law at the time of the events in question must have given the officers fair warning that their conduct was unconstitutional.

*See Kelsay v. Ernest*, 933 F.3d 975, 979 (8th Cir. 2019) (en banc) (cleaned up).

If Street Fest constituted a traditional public forum, the removal of Sessler from Street Fest must satisfy the level of scrutiny applied to traditional public forums. *See Phelps-Roper v. Nixon*, 509 F.3d 480, 485 (8th Cir. 2007). This level of scrutiny varies based on whether the regulation is content based or content neutral. *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983). "For the state to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Id.* For the state to "enforce [a] regulation[] of the time, place, and manner of expression which [is] content-neutral," the regulation must be "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Id.*

Here, Sessler argues that "Davenport's exclusion policy, instilled in the special event process, empowers a permittee to exclude disfavored people and speech from the confines of the permitted space. And, in turn, DDP [the Downtown Development Partnership] exercised this privilege to expel Sessler due to the content

-12-

of his message." Appellant's Br. at 23. In Sessler's prior appeal, we determined that the Special Events Policy is "a content-neutral permitting scheme." *Sessler v. City of Davenport*, 990 F.3d 1150, 1155 (8th Cir. 2021). The question, therefore, is whether precedent *clearly established* that the Special Events Policy was "applied to Sessler" in an unconstitutional manner. Appellant's Br. at 12; *see also Parks v. City of Columbus*, 395 F.3d 643, 653 ("This case presents us with a unique situation. We are not faced with a challenge to the ordinance in and of itself being an unconstitutional time, place, or manner restriction of [the plaintiff's] speech. Rather, [the plaintiff] argues that both the ordinance and permit scheme as applied in this situation are unconstitutional.").

Sessler relies primarily on *Johnson v. Minneapolis Park & Recreation Board*, 729 F.3d 1094 (8th Cir. 2013), to show that the law was clearly established that the officers' removal of Sessler from Street Fest violated his constitutional rights. Specifically, Sessler contends that *Johnson*'s "underlying facts . . . are strikingly similar" and "*Johnson* is squarely on point." Appellant's Br. at 38, 39. In *Johnson*, the plaintiff, who desired to distribute Bibles, sought "a preliminary injunction against enforcement of a local regulation that restricts literature distribution in a public park during the Twin Cities Pride Festival." 729 F.3d at 1096. The regulation "restrict[ed] literature distribution to booths during the Festival." *Id.* at 1099. The personal distribution of literature within the Festival was not allowed. *Id.* at 1098. The parties agreed that the public park constituted a traditional public forum, and we assumed that the "regulation should be treated as content-neutral." *Id.* at 1099. The city parks board maintained that the regulation's "restricting [of] literature distribution to booths during the Festival is narrowly tailored to serve its significant interest in maintaining the orderly flow of people, providing access for security and emergency vehicles, and facilitating the activities of the participants of the Festival." *Id.* It "reason[ed] that the restriction on literature distribution serves the legitimate interest in crowd control, because literature distribution from outside of booths increases congestion and congestion impedes emergency, security, and delivery vehicles." *Id.* at 1100.

We held that although "controlling crowds can constitute a significant governmental interest that bears directly on public safety" "[i]n the abstract," the city parks board failed to "show[] that the literature distribution regulation is narrowly tailored to serve that interest in this instance." *Id.* First, the city parks board produced scant evidence that prohibiting literature distribution furthered its asserted significant governmental interest. *Id.* Second, the regulation was underinclusive because the city parks board permitted street performers, whose "very purpose is to draw a crowd." *Id.* at 1101. The city parks board's "satisf[action] with informal case-by-case action with respect to performers but insist[ance] on a blanket ban on distribution of literature outside booths diminishe[d] the credibility of its asserted rationale." *Id.*

Despite Sessler's insistence, *Johnson* does not clearly establish that the officers' removal of Sessler from Street Fest violated his constitutional rights. Sessler makes an as-applied challenge to an otherwise content-neutral policy; the issue is whether the officers' removal of him from Street Fest was based on the content of his speech or on his conduct and the corresponding level of scrutiny. By contrast, *Johnson* involved a facial challenge focused on whether the regulation— which we assumed was content-neutral—satisfied the appropriate level of scrutiny based on the city parks board's asserted significant government interest in crowd control. *Johnson* does not provide the "controlling authority" necessary to "place[] the . . . constitutional question beyond debate at the time of the alleged violation." *Kelsay*, 933 F.3d at 979 (cleaned up).

In the absence of controlling authority, we can examine persuasive authority to see if the violation of Sessler's constitutional rights was clearly established. *See id.* Three persuasive authority decisions vie for consideration: *Parks*, 395 F.3d 643; *Startzell v. City of Philadelphia*, 533 F.3d 183 (3d Cir. 2008); *Bible Believers v. Wayne Cnty.*, 805 F.3d 228 (6th Cir. 2015).

In *Parks*, a demonstrator, who attended a public arts festival held pursuant to a non-exclusive block party permit, was removed from the festival because "the

-14-

sponsor of the event did not want him there." 395 F.3d at 646. After being removed and finding speech efforts outside the festival to be futile, he ceased his speech efforts and sued for injunctive relief, declaratory relief, and damages for the violation of his First Amendment right to free speech. *Id.* No facts were in dispute. *Id.* After the district court dismissed the demonstrator's complaint with prejudice, the demonstrator appealed.

On appeal, the demonstrator argued that "the ordinance and permit scheme as applied in this situation are unconstitutional." *Id.* at 653. The Sixth Circuit first determined that the demonstrator was removed based on the content of his speech. *Id.* "The City offered no explanation as to why the sponsor wanted him removed." *Id.* Nor was there any evidence that "the [a]rts [c]ouncil had a blanket prohibition on the distribution of literature or that others engaging in similar constitutionally protected activity were removed from the permitted area." *Id.* Crucially, the court "f[ound] it difficult to conceive that [the demonstrator's] removal *was based on something other than the content of his speech*." *Id.* (emphasis added). Having found that the officer removed the demonstrator based on his speech, the court applied strict scrutiny. *Id.* Because the city offered no compelling state interest to justify its prohibition on the demonstrator's exercise of his free speech rights at the public arts festival, a traditional public forum, the court held that the city violated the demonstrator's First Amendment rights. *Id.*

In *Bible Believers*, members of a Christian evangelical group, who attended a city festival celebrating Arab culture, were removed from the festival because of the crowd's hostile reaction to their speech. 805 F.3d at 239–40. The group's "speech [was] the cause for the unrest." *Id.* at 240. The officers informed the group that if they did not leave the festival, they would be cited for disorderly conduct. *Id.* The group departed. *Id.* The group and its members filed suit against the county, its sheriff, and deputies, alleging that their expulsion had effectuated a heckler's veto in violation of their First Amendment rights. *Id.* at 241. After the district court granted summary judgment in favor of the defendants, the group and its members appealed. *Id.* at 242.

On appeal, content neutrality became the principal issue. *Id.* at 247. The Sixth Circuit held that the defendants' "actions were decidedly content-based." *Id.* "'Listeners' reaction to speech is not a content-neutral basis for regulation' or for taking an enforcement action against a peaceful speaker." *Id.* (first quoting *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 134 (1992), then citing *Brown v. Louisiana*, 383 U.S. 131, 133 n.1 (1966)). According to the court, "It [was] *indisputable* that [the defendants] acted against the [Christian evangelical group] in response to the crowd's negative reaction." *Id.* (emphasis added). "[A]bundant evidence" existed "that the police . . . effectuated a heckler's veto." *Id.* The court noted the irrelevance of whether the plan that the officers followed was "content-neutral because the officers enforcing it [were] ordained with broad discretion to determine, based on listener reaction, that a particular expressive activity [was] creating a public danger." *Id.* Because the officers' removal of the group was content based, strict scrutiny was applicable. *Id.* at 253. The court held that strict scrutiny was not satisfied.

In contrast to *Parks* and *Bible Believers*, the Third Circuit held in *Startzell* that the city police's movement of religious protestors because they interfered with or disrupted a permitted gay-pride event effectuated "justified, reasonable, content-neutral regulations of the time, place, or manner of their expression." 533 F.3d at 203. The protesters' means of speaking (bullhorns and musical instruments) and their nearness to the main stage of the permitted event created legitimate concerns for potential disruptive conflict. *Id.* at 190–91. "Once the musical program began on the main stage, [the police] instructed [the protestors] to move farther up [the] [s]treet so that they would not block the stage or interfere with its activities, noting that OutFest held a permit to hold a program on stage." *Id.* at 191. Thereafter, the protestors "c[a]me to a standstill in the middle of the street." *Id.* The police informed the protestors that "they had to move again because there were complaints that they were blocking access to vendor booths." *Id.* The police instructed the protestors to move toward another street, "near a popular gay bar . . . that was located within the OutFest permit area but at its perimeter." *Id.* The protesters refused, and the police arrested the protesters for disorderly conduct and for refusing to obey police orders.

-16-

*Id.* The protesters sued the city, and the district court granted the city's motion for summary judgment on the protesters' First Amendment claims. *Id.* at 191–92.

On appeal, the religious protestors asked the Third Circuit "to disregard [the non-profit organization's] permit to hold OutFest because they believe[d] the non-exclusive permit did not give the police the right to restrict their speech." *Id.* at 198. But the Third Circuit distinguished impermissible disruptive activity from protected speech, stating:

> The right of free speech does not encompass the right to cause disruption, and that is particularly true when those claiming protection of the First Amendment cause actual disruption of an event covered by a permit. The City has an interest in ensuring that a permit-holder can use the permit for the purpose for which it was obtained. This interest necessarily includes the right of police officers to prevent counter-protestors from disrupting or interfering with the message of the permit-holder. Thus, when protestors move from distributing literature and wearing signs to disruption of the permitted activities, the existence of a permit tilts the balance in favor of the permit-holders.

*Id.* at 198–99.

The court concluded that "[t]he police action was not based on the content of [the protestors'] message but on their conduct." *Id.* at 199. A video showed that the protestors "used bullhorns and microphones in an attempt to drown out the platform speakers and then, most significantly, congregated in the middle of the walkway." *Id.* The court determined that "ample justification" existed for the police to order the protesters "to move when they interfered with the permitted event's activities by expressing their message with loud bullhorns right next to the main stage where musical performances were held, directly confronting a transgendered individual, and blocking access to the vendors who had applied for booths at [the gay-pride event]." *Id.* (footnote omitted). The court concluded, "Because [the protestors] were interfering with the permitted event's message, something the other [festival] attendees were not doing, the police were justified in directing [the protestors']

movement away from the stage and the vendors." *Id.* (citation omitted). The court found "no evidence" that "the [c]ity's actions were based on the content of the speech." *Id.* at 200. Instead, it was "apparent that the police understood [the protestors] had rights under the First Amendment to express their message, but in directing [the protestors] to move to another location within [the festival] they were merely imposing a content-neutral time, place, or manner restriction." *Id.*

Officers testified that separation was necessary "for the safety and welfare of everybody concerned" and that "'the significant part' of the reason . . . to move [the protestors] was because they were blocking the vendors." *Id.* "Although [an officer] admitted there was 'a potential' for the crowd to get hostile based on [the protestors'] message, the undisputed evidence show[ed] [the protestors] . . . had attracted a crowd that was blocking access to the vendor booths." *Id.* (citation omitted). The court found no evidence suggesting "that the police direction to [the protestors] to move to a different location was based on content or viewpoint." *Id.* Instead, the police's request that the protestors move constituted "a content-neutral response to the interference caused by [the protestors]' actions and loud speech with the permitted event's activities." *Id.* at 201. "Preclusion of a message is the evil at which the content-neutrality principle is aimed," the court explained, "not arrangements of a public forum so that individuals and groups can be heard in an orderly and appropriate manner." *Id.* (internal quotation marks omitted).

Applying these cases to the instant case, was the law clearly established that the officers' removal of Sessler violated his constitutional rights? It depends upon whether *the officers* removed Sessler *because of* complaints about the *content of his message* (what he was saying), his *conduct* (what he was doing), or some *combination of the two*. *See Solomon v. Petray*, 699 F.3d 1034, 1038 (8th Cir. 2012) ("[T]he court determines whether the implicated right was clearly established at the time of the deprivation."). If the record shows that the officers removed Sessler from Street Fest because of the content of his message, *Parks* and *Bible Believers* clearly establish that the officers violated Sessler's First Amendment rights. If the record shows that the officers removed Sessler from Street Fest because of his conduct or

-18-

based on a combination of Sessler's conduct *and* message, then *Startzell* supports a conclusion that the law was *not* clearly established that Sessler's constitutional rights were violated.

In reviewing a district court's grant of summary judgment based on qualified immunity,

> courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion. In qualified immunity cases, this usually means adopting the plaintiff's version of the facts. However, this does not mean that the court should deny summary judgment any time a material issue of fact remains on the constitutional violation claim because to do so could undermine the goal of qualified immunity to avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment. Rather, the court must take a careful look at the record, determine which facts are genuinely disputed, and then view those facts in a light most favorable to the non-moving party as long as those facts are not so blatantly contradicted by the record that no reasonable jury could believe them.

*O'Neil v. City of Iowa City*, 496 F.3d 915, 917 (8th Cir. 2007) (cleaned up). Additionally, courts must consider all undisputed facts in reviewing the grant of summary judgment based on qualified immunity. *See Murphy v. Engelhart*, 933 F.3d 1027, 1028 (8th Cir. 2019) ("Viewing the undisputed facts most favorably to . . . the non-moving party, we conclude that [the officer's] actions did not violate [the non-moving party's] clearly established constitutional right . . . ."). To add another layer of complexity to our inquiry, we must also consider whether, based on these facts, a "*reasonable officer* would have *known* that his conduct was unlawful due to a robust consensus of authority from other circuits." *Graham v. Barnette*, 5 F.4th 872, 887 (8th Cir. 2021) (emphases added). "We adopt the perspective of a reasonable officer at the scene, *taking into account the information he possessed at the time*. For a plaintiff to overcome qualified immunity, existing precedent must have placed the

constitutional question beyond debate." *Barton v. Taber*, 820 F.3d 958, 966 (8th Cir. 2016) (emphasis added) (cleaned up).

The following constitutes the relevant undisputed facts, combined with those disputed facts construed in the light most favorable to Sessler: Sessler and his group "initially engaged in street preaching activities at the corner of Second Street and Main Street inside of the Street Fest Festival." R. Doc. 23, at 4. They were asked to leave that spot because another group had paid a fee to reserve the location. When later asked again to leave the spot, Sessler disputed with Officers Smith and Behning whether the festival was public space for enabling free speech or private ground.

The officers discussed with Sessler DDP's willingness to provide the group "an area away from the public sidewalk where [Sessler] was standing" R. Doc. 96-1, at 3. Sessler's group and the officers attempted to negotiate a suitable location. "Sessler's group ultimately agreed" to move to the "courtyard adjacent to West Second Street." R. Doc. 107, at 6. Before the group moved to that location, Officer Smith informed them "if you're screaming over the top of [vendors] or impeding their point of sales at all, then we're going to have to fix that again." *Id.* (quoting R. Doc. 42, at 08:45–55).

Officer Alcala then accompanied Sessler's group to the courtyard identified by Officer Smith. Upon arrival, "[Sessler] and Officer Alcala could not agree on an appropriate location within or near the . . . [c]ourtyard for [Sessler] to engage in street preaching activities." R. Doc. 23, at 4. Officer Alcala's concern was Sessler and his group intruding on paid vendor positions set up on the street adjacent to the courtyard, while Sessler's concern was vendor tents blocking the group from interacting with the festival attendees. Sessler "told Officer Alcala that he was willing to turn off his amplification and just use the sound of his voice." R. Doc. 96-2, at 3. "Accepting the disagreement, [Officer] Alcala smiled and said, 'we're trying to compromise.'" R. Doc. 107, at 6 (quoting R. Doc. 15:22-35). Sessler and Officer Alcala departed the courtyard in search of a different location. *Id.*

-20-

After further negotiation, "[Sessler] and his group were allowed to move to an area near Street Fest's entrance on Brady Street and Second Street." R. Doc. 23, at 5. Sessler and his group preached at this location for 30 minutes.

The crowd's interactions with Sessler and his group reflected problems both with his message *and* his methods. By Sessler's own admission, at least "one or two people" "winced" in discomfort from the volume. R. Doc. 91-3, at 113. Sessler also acknowledged that, due to the volume of his amplified preaching, "vendors or those purchasing from the vendors in that direct area" "would have had to [] walk[] at least 30 feet to [be] outside of the sound of [Sessler's] voice." *Id.* "While Sessler preached, nearby vendors expressed concern about the effect of Sessler's preaching on their customers." R. Doc. 107, at 6 (citing Doc. 40, 0:49–1:10). Video footage captured one vendor "exclaiming: 'I'm losing business.'" *Id.* (quoting R. Doc. 42, at 17:27–30). This same vendor subsequently joined a second vendor in complaining to Officer Behning. "The first vendor complained: 'they're telling our customers that they're going to Hell.' The second vendor complained that Sessler and his group were 'standing in front of our booths.'" *Id.* at 7 (first quoting R. Doc. 40, at 1:04–10, then quoting R. Doc. 40, at 0:49–1:04).[4]

Vendors also complained to DDP Director Jason Gilliland about Sessler's impact on their business. R. Doc. 91-3, at 138–39 ("The majority of the complaints I was getting were from vendors because they felt that their business was being impacted."). Specifically, "people were not wanting to be in [the vendors'] booth and were spending less time there." *Id.* at 139. "The complaints were that [Sessler and his group] were driving customers away in general." *Id.* at 143.

[4]The dissent acknowledges the undisputed fact that Officer Behning received the complaint about Sessler's group blocking a vendor's booth but places emphasis on the fact that the video does not actually show Sessler's group blocking customers from approaching any vendors. But when determining whether qualified immunity applies, we are required to "adopt the perspective of a reasonable officer at the scene, taking into account the *information he possessed* at the time." *Barton*, 820 F.3d at 966 (emphasis added). A reasonable officer at the scene would have received the vendor's complaint that Sessler's group was blocking access to the vendor's booth.

Gilliland then complained to Officer Behning about Sessler, stating that "lots of people and vendors have been getting very upset." R. Doc. 107, at 7 (quoting R. Doc. 40, at 0:36–46). Gilliland then asked Officer Behning to remove Sessler and his group for the following reason:

> [W]e had been trying to compromise with them on the location, and we were continuing to get complaints specifically from vendors. And we wanted to make sure that, you know, we were upholding, you know, what we were promising to those vendors and make sure that we had a good event for the public as well.

R. Doc. 93-1, at 140.

After speaking with Gilliland, Officer Behning approached Sessler and told him that his group would have to leave the festival's grounds. Officer Behning told Sessler that "vendors had 'taken offense' to some of [Sessler's] 'comments.'" R. Doc. 96-2, at 4. These comments "had 'created some conflict' and had resulted in some 'aggravated people.'" *Id.* Officer Behning told Sessler that the festival's organizer did not want Sessler at the festival because the organizer "did not 'want that kind of an atmosphere'" and that the organizer wanted Sessler "to 'leave their grounds' and did not want him 'on their grounds.'" *Id.* Officer Behning stated that the festival "was 'not public'" and that "because the organizer here has got a permit, he's got it leased, he's responsible for it, he controls it." *Id.* Officer Behning advised Sessler "that it was against the law for him to be in the [f]estival area, and that if he did not leave the [f]estival area, he would be subject to arrest." *Id.* at 5. Officer Behning provided Sessler with no other option but to leave the festival. *Id.* Officer Behning advised Sessler "that he could continue his street preaching activities directly across the street from the Street Fest festival." R. Doc. 23, at 5. Sessler and his group complied; they moved to the suggested location and preached approximately two to three hours. *Id.*

Construing the facts in the light most favorable to Sessler, I conclude that the case presents a unique fact pattern for which "existing precedent" would not "have

placed the . . . constitutional right beyond debate." *See Bus. Leaders In Christ v. Univ. of Iowa*, 991 F.3d 969, 980 (8th Cir. 2021) (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)). As in *Parks* and *Bible Believers*, there are facts indicating that Sessler's removal was based—at least in significant part—on the content of Sessler's speech. One vendor stated, "I'm losing business," and later joined a second vendor in complaining that Sessler was telling the customers they were "going to Hell." R. Doc. 107, at 6 (quoting R. Doc. 40, at 1:04–10). Officer Behing told Sessler that "[f]estival attendees and vendors had 'taken offense' to some of [Sessler's] 'comments,' and that his speech had 'created some conflict' and had resulted in some 'aggravated people.'" *Compare* R. Doc. 96-2, at 4, *with Parks*, 395 F.3d at 654 ("The City offered no explanation as to why the sponsor wanted him removed."); *Bible Believers*, 805 F.3d at 240 (finding a content-based restriction where the officer stated that "part of the reason they throw this stuff . . . is that you tell them stuff that enrages them," and stated, "ya know, apparently what you are saying to them and what they are saying back to you is creating danger" (alteration in original)).[5]

But that is not the *complete* story based on the factual record. And we must consider *all* the *undisputed* facts. The record shows that, as in *Startzell*, Sessler and his group caused actual disruption at the festival. First, it is undisputed that Sessler's speech was not the catalyst for his initial relocation to another area within the festival; instead, he was occupying an area "assigned by DDP to a fee-paying juggling and magic vendor." R. Doc. 23, at 4.

Second, it is undisputed that Sessler and another adult member of the group were "using a portable microphone and speaker to amplify their voices." R. Doc.

---

[5]But unlike *Parks* and *Bible Believers*, the vendors' statements show that their aggravation was based not just on what Sessler was saying but on the secondary effects of Sessler's speech: the deterioration of their customer base. *Compare Bible Believers*, 805 F.2d at 239 ("After approximately seven minutes of proselytizing, some elements of the crowd began to express their anger by throwing plastic bottles and other debris at the Bible Believers."). For purposes of my analysis, I will assume this distinction makes no difference.

107, at 5 (citing R. Doc. 42, at 3:55–4:00). Officer Smith's concern about the group moving to alternative locations was *not* based upon Sessler's speech but because of (1) use of his amplified voice hampering a vendor and (2) "too much foot traffic moving through [the] area," resulting in a "choke point." *Id.* (quoting R. Doc. 42, at 5:05–33). When the group finally settled on an alternative location, Officer Smith did not caution Sessler about the content of their speech but its volume, warning them that "if you're screaming over the top of [vendors] or impeding their point of sales at all, then we're going to have to fix that again." *Id.* (alteration in original) (quoting R. Doc. 42, at 8:45–55).

Third, it is undisputed that Sessler's speech was not the reason for Officer Alcala's rejection of the second location. Officer Alcala explained to Sessler that the group "could not set up in the street adjacent to the courtyard because those locations were 'paid vendor positions.'" *Id.* (quoting R. Doc. 42, at 13:00–10).

Fourth, Sessler's loudness was, at least in part, a basis for people's reactions and complaints about Sessler. By Sessler's own admission, "vendors or those purchasing from the vendors" at the third location "had to . . . walk[] at least 30 feet to [be] outside of the sound of [Sessler's] voice." R. Doc. 91-3, at 113. Sessler also admitted to seeing one or two individuals "wince[]" when they walked in front of the amplification equipment. *Id.* And it was at this third location that one vendor complained to Officer Behning "that Sessler and his group were 'standing in front of our booths,'" thereby blocking customers from accessing them. R. Doc. 107, at 6 (R. Doc. 40, at 0:49–1:04). Complaints about Sessler blocking booths is not related to Sessler' speech.[6]

The officers had received complaints about Sessler's disruptive conduct *and* the contents of his speech. Would a reasonable officer at the time have been on notice

---

[6]Whether Sessler and his group were actually blocking the booths is not at issue; what is material is whether the vendor *communicated* that to Officer Behning and the conclusion a reasonable officer could draw from that. *See Barton*, 820 F.3d at 966.

that removing Sessler from Street Fest would violate his constitutional rights? In *Startzell*, an officer had "admitted there was 'a potential' for the crowd to get hostile based on [the protestors'] message," but the Third Circuit ultimately concluded that the officers' movement of the protestors to a different location was content neutral because of undisputed evidence that the protestors "had attracted a crowd that was blocking access to the vendor booths." 533 F.3d at 200. Lacking precedent from this circuit, and considering the conclusions reached by our sister circuits based on discrete facts in *Parks*, *Bible Believers*, and *Starzell*, I conclude that a reasonable officer would not have been on notice that he was violating Sessler's constitutional rights. The inconsistency of their actions with his constitutional rights was not beyond debate.

ERICKSON, Circuit Judge, dissenting.

The majority holds that "no reasonable trier of fact could conclude from the summary judgment record that the officers' actions were anything but content neutral." Because I believe a reasonable trier of fact could conclude that the decision was not content neutral, I respectfully dissent. Officer Behning's rationale for removing Sessler, the contemporaneous statements from vendors and customers, and the dearth of secondary effects of Sessler's speech demonstrate a question of fact exists on the issue of content neutrality.

The majority maintains that "this is a case about disruption by a speaker who had received repeated warnings about his volume." However, the record shows that Officer Behning did not mention Sessler's volume when he asked Sessler to leave Street Fest. Importantly, one of Sessler's colleagues offered to turn down the group's amplification—an offer that was not accepted by Officer Behning. Instead, Officer Behning stated that the event's organizer was unhappy with the atmosphere Sessler's group created and that attendees and vendors had taken offense to Sessler's message, including telling people they were going to hell.

In his deposition, Officer Behning could not recall any complaints about Sessler's group making physical contact with attendees, blocking foot traffic, or preventing ingress and egress to the festival, but admitted that a provocative message causing agitation would be grounds for removal from Street Fest. While some vendors complained that Sessler's group was blocking their customers, others asserted that patrons were avoiding their booths altogether because of the preaching, which by itself is not a constitutionally sound reason for exclusion. Forsyth Cnty. v. The Nationalist Movement, 505 U.S. 123, 134 (1992) (stating "[l]isteners' reaction to speech is not a content-neutral basis for regulation."). Nothing in the video that is in the record shows Sessler's group blocking customers from approaching any vendors.

Taking the facts in the light most favorable to Sessler and drawing all reasonable inferences in his favor, as we must at this stage in the litigation, there is at least a fact question as to whether he was removed because of the content of his message or because of secondary effects like volume. See Lewis v. Wilson, 253 F.3d 1077, 1081 (8th Cir. 2001) (determining the state's rejection of an "ARYAN-1" vanity plate due to its potential to provoke road rage was an unconstitutional content-based restriction, rather than a valid regulation of the secondary effects of speech).

The concurrence asserts that even if we assume a constitutional violation occurred, the Officers were entitled to qualified immunity because Sessler's rights were not clearly established. But the right to be free from content-based restrictions on speech due to listener reactions is clearly established, Forsyth Cnty., 505 U.S. at 134, and the only reasons Officer Behning gave Sessler for his ultimate exclusion from Street Fest were listener reactions. The additional facts cited by the concurrence do not alter this conclusion. The Officers' removal of Sessler from the first two locations due to foot traffic, noise, and vendor setups—conduct which remains unchallenged by Sessler—does not cure the constitutional infirmities of the Officers' conduct at the third location and ultimate removal of Sessler from the festival. And the single vendor complaint about Sessler blocking a booth, which

-26-

Officer Behning never mentioned, is belied by the video.  In contrast, the "facts indicating that Sessler's removal was based—at least in significant part—on the content of Sessler's speech," as noted by the concurrence, were enough to place the unconstitutionality of the Officers' actions beyond debate under <u>Forsyth Cnty</u>.  <u>See Scott v. Harris</u>, 550 U.S. 372, 378 (2007) (finding that appellate courts "usually . . . adopt[] . . . the plaintiff's version of the facts" when evaluating summary judgment in the qualified immunity context).

_____